CITY OF NOME, Appellant,

v.

CATHOLIC BISHOP OF NORTHERN ALASKA, Appellee.

The AMERICAN LUTHERN CHURCH, Community United Methodist Church, the National Division of the Board of Global Ministries of the United Methodist Church, and the Women's Division of the Board of Global Ministries of the United Methodist Church, Appellants/Cross-Appellees,

v.

CITY OF NOME, Appellee/Cross-Appellant.

Nos. S–37, S–38 and S–36.

Supreme Court of Alaska.

Oct. 4, 1985.

R. Eldridge Hicks, Brian Carter Boyd, Lane, Powell, Barker & Hicks, Anchorage, for appellant/appellee/cross-appellant, City of Nome.

Charles D. Silvey, Schaible, Staley, DeLisio & Cook, Fairbanks, for appellee, Catholic Bishop of Northern Alaska.

Before BURKE, C.J., and RABINOWITZ, MATTHEWS, COMPTON and MOORE, JJ.

Thomas H. Dahl, Anchorage, for appellants/cross-appellees, Lutheran and Methodist Church Groups.

OPINION

BURKE, Chief Justice.

## TABLE OF CONTENTS

I. INTRODUCTION ........................................ 874

II. STANDARD OF REVIEW ............................... 875

III. PROCEDURAL ISSUES ................................. 876
 A. Remand ............................................. 876
 B. Standing ............................................ 877
 C. Stay of Taxes ...................................... 877

IV. PRELIMINARY ISSUES ................................. 878
 A. "Exclusive Use" is Required .......................... 879
 B. Spatial Apportionment is Required .................... 881

V. RELIGIOUS RESIDENCES .............................. 881
 A. May a Single Parish Contain More Than One Exempt Residence? ............................................. 882
 B. May the Residence of an Assistant Pastor be Exempt? .. 882
 C. Must a Pastor be Available and Committed Exclusively as a Clergyman for a Local Congregation in Order to Have an Exempt Residence? ..................................... 883
 D. Is the Residence of a Religious Worker Not Listed in AS 29.53.020(b)(1) Exempt? ............................... 884
 E. Is the Residence of a Religious Worker Not Listed in AS 29.53.020(b)(1) Directly Incidental to and Vitally Necessary for the Use of Other Exempt Property? ................ 884
 F. Is the Residence of Members of a Religious Order, Which is Not the Order's Monastery, Exempt? .................... 886

VI. CHURCH SANCTUARIES, RELIGIOUS ADMINISTRATIVE OFFICES AND RELIGIOUS EDUCATION ............... 887

VII. PROGRAMS OPERATED BY THE CHURCH OWNER ...... 887
 A. What is a "Charitable Purpose"? ...................... 887
 B. When Does Payment for a Service Taint What was Otherwise An Exempt Activity? ........................... 888
 C. KNOM Radio Station ................................. 889
 1. Is KNOM used exclusively for "public worship"?..... 890
 2. Is KNOM used for "religious education"?............ 890
 3. Is KNOM used for "charitable purposes"? ........... 890

D. Youth Hostel ....................................... 891
E. Thrift Shop ......................................... 891

VIII. CHURCH PROPERTY LEASED TO OTHER NON–PROFIT
ORGANIZATIONS ................................... 891

IX. SUPPORT PROPERTIES ................................ 892
A. KNOM-Related Properties ........................... 893
B. Garage and Heating Plant ........................... 893
C. Quonset Hut ....................................... 893
D. Lutheran Garage ................................... 894
E. KD Building ....................................... 894
F. Lutheran Apartment ................................ 894
G. Young Center Storage and Parking and Methodist Office
Building and Garage ................................ 895
H. Seaview House Storage .............................. 895

X. CONCLUSION ........................................ 895

## I. INTRODUCTION

These are consolidated appeals from two superior court decisions. That court reviewed the City of Nome's refusal to allow tax exemptions under AS 29.53.020(a)(3) for properties claimed to have been used exclusively for nonprofit religious, charitable and educational purposes. Three separate entities claim exemptions: the Catholic Bishop of Northern Alaska ("Catholics"), the American Lutheran Church ("Lutherans"), and one local plus two national units of the United Methodist Church ("Methodists"). Each appealed denials of exemptions for four tax years, 1979 through 1982.

Procedurally, the cases are similar. Each church applied for exemptions to the Nome City Assessor in each of these years, and each was denied exemption on a portion of its property. The churches appealed these denials to the City Council of the City of Nome, sitting as the Board of Equalization ("Board" or "City"). AS 29.-53.135. The Board affirmed the denials, and the churches appealed to the superior court. The superior court issued comprehensive decisions,[1] affirming in part, reversing in part, and remanding in part.

The Lutherans and Methodists now appeal the relevant superior court decision to this court, and the City cross-appeals. The City appeals the court's rulings on the Catholics' properties. For convenience, the cases have been consolidated.

The appeal concerns tax exemptions under AS 29.53.020. The churches sought to exempt religious residences, administrative offices, sanctuaries, and property used for both religious educational and charitable purposes. They also sought to exempt properties used as support for exempt properties, and church property leased to other nonprofit organizations. For each exemption we interpret AS 29.53.020 to require both spatial apportionment and exclusive use for a religious, charitable or educational purpose. We recognize two narrow exceptions to the "exclusive use" requirement. First, a *de minimus* use will not defeat the exemption. Second, property may be exempt if its use is both directly incidental to and vitally necessary for the use of exempt property. We also acknowledge that some church property leased to other nonprofit organizations may be exempt. Finally, we recognize that support property may be exempt if it is necessary to the convenient use of exempt property. In this opinion, we apply these rules to the numerous properties at issue, and summarize our rulings in chart form for the City on remand. *See* section X.

---

**1.** There are only two superior court decisions because the Lutherans and Methodists consol- idated their cases for trial.

## II. STANDARD OF REVIEW

■ As a general rule, we approach issues independently of the superior court when that court acts as an intermediate court of appeal. *Burgess Construction v. Smallwood*, 698 P.2d 1206 (Alaska 1985); *Jager v. State*, 537 P.2d 1100, 1106 (Alaska 1975). That rule, however, does not apply here. In this case, the Board set forth no findings of fact when it denied exemptions to the churches. Since the hearing transcripts inadequately reflected the basis for the Board's decisions, the superior court entered its own findings of fact. It based these upon the parties' briefs and the record on appeal. The superior court thus exercised the discretion authorized by Appellate Rule 609[2] to "grant a trial de novo in whole or in part."[3] When the superior court conducts a trial *de novo*, we review only the superior court's decisions. *Kott v. City of Fairbanks*, 661 P.2d 177, 180 n. 1 (Alaska 1983).

■ We note that the Board erred by not entering findings of fact and conclusions of law in its determinations. Even absent a statutory duty to make findings, an agency[4] that makes an adjudicative decision must articulate its reasons. *See Kenai Peninsula Borough v. Ryherd*, 628 P.2d 557, 562 (Alaska 1981) (requiring findings in formal adjudications); *Fields v. Kodiak City Council*, 628 P.2d 927, 933 (Alaska 1981) (requiring findings in informal adjudications). Such findings

> facilitate judicial review, insure careful administrative deliberation, assist the parties in preparing for review, and restrain agencies within the bounds of their jurisdiction.

*Fields*, 628 P.2d at 932 (quoting *Mobil Oil Corp. v. Local Boundary Commission*, 518 P.2d 92, 97 n. 11 (Alaska 1974)). This rule covers a board of equalization's exemption determinations because they are essentially informal adjudications. *See Application of Lakeview Gardens*, 605 P.2d 576, 582 (Kan.1980).

■ The parties dispute whether certain properties deserved exemption under AS

---

2. The superior court may only grant a trial *de novo* of administrative proceedings when justice requires an independent review. The usual deferential review of administrative agency factfinding allows judicial economy and allows agencies to serve as fact finders where their expertise at least equals the judiciary's. *Harmon v. North Pacific Union Conference Ass'n of Seventh Day Adventists*, 462 P.2d 432, 435 (Alaska 1969). *See also Matanuska Susitna Borough v. Lum*, 538 P.2d 994, 1000 (Alaska 1975). Here, the superior court might preferably have immediately remanded the appeals to the City for findings of fact and conclusions of law. The court, however, did not abuse its discretion by offering a speedier resolution of these consolidated appeals, particularly since much of the evidence in the record was not disputed.

This court need *not* decide whether state law *mandated* the superior court to hold a trial *de novo*. This court has never resolved whether AS 29.53.140(f), which provides that "[a]n appellant may appeal to the superior court for, and is entitled to, trial de novo of the board's [valuation decision]", applies to appeals from the board's tax exemption decisions. *See Harmon*, 462 P.2d at 435 (discussing AS 29.10.426, predecessor of AS 29.53.140). *See generally State v. Lundgren Pacific Constr.*, 603 P.2d 889, 893 (Alaska 1979); *Lum*, 538 P.2d at 998; *Winegardner v. Greater Anchorage Area Borough*, 534 P.2d 541 (Alaska 1975); *Keiner v. City of Anchorage*, 378 P.2d 406 at 410 (Alaska 1963). Here, all church parties waived their right to try this issue on appeal. Application of AS 29.53.-140(f) to exemption determination appeals awaits another day.

3. Both this and other courts have recognized the variety of forms of *de novo* review. *Lundgren Pacific Constr.*, 603 P.2d at 898-99 (Matthews, J., concurring); *Pledger v. Cox*, 626 P.2d 415, 416 (Utah 1981). A pure trial *de novo* requires a new hearing and a new record. In the interests of judicial economy and an early resolution of the appeal, the superior court declined to hold such a trial.

A trial *de novo* "on the record"—as held by the court—requires independent findings of fact from evidence *already* in the record. *Kott v. City of Fairbanks*, 661 P.2d 177, 180 n. 1 (Alaska 1983). The evidence presented to the Board has since been transcribed into a voluminous record. Mere evidence alone, however, does not make "findings of fact." In its decisions as the Board of Equalization, the City Council never articulated its view of the evidence. In essence, the City made no findings at all. The superior court's assessment of the facts, therefore, is its own. We conclude that the superior court made independent findings of fact.

4. The Board of Equalization is an administrative agency for purposes of appeal. *Winegardner*, 534 P.2d at 545; *Keiner*, 378 P.2d at 410.

29.53.020(a)(3) as properties used exclusively for nonprofit religious, charitable and educational purposes. Since our decision requires interpretation of statutory and case law, we do not defer to the City's administrative expertise. Rather, we review the City's decisions under the "substitution of judgment test." *Earth Resources v. State, Department of Revenue*, 665 P.2d 960, 965 (Alaska 1983); *Jager*, 537 P.2d at 1107 n. 23; *Kelly v. Zamarello*, 486 P.2d 906, 916 (Alaska 1971).

This court will not overturn the superior court's factual findings unless clearly erroneous.[5] Alaska R.Civ.P. 52(a). "A finding of fact is clearly erroneous only when this court is left with the firm and definite conviction on the entire record that a mistake has been made." *Stanton v. Fuchs*, 660 P.2d 1197, 1198 (Alaska 1983). However, no Alaska court has determined the proper standard of review of factual findings made by a superior court exercising its partial trial *de novo*[6] powers after an administrative adjudication. In *Kott*, 661 P.2d at 180, we did not decide the issue because the parties stipulated to the "substantial evidence" test.

█ If this court were reviewing the Board's factual findings, we would use the "substantial evidence" test. *Earth Resources*, 665 P.2d at 964; *Jager*, 537 P.2d at 1107 n. 23. However, Appellate Rule 609 provides that on a trial *de novo* "[the] proceedings in such action shall be governed by the rules governing procedure in the superior court...." Thus, we hold that when a court is the fact finder for an otherwise administrative proceeding, the traditional "clearly erroneous" standard of review applies.

## III. PROCEDURAL ISSUES

### A. *Remand*

After announcing the appropriate legal standards, the superior court remanded portions of each case to the City for further determination. *See* chart *infra* section X. The court considered the factual record inadequate to resolve the issues under the announced standards. *Id.* The court's opinions implicitly require the City to hold any hearings necessary to gather evidence required to resolve the remanded issues.

The City contends that the remand for further evidentiary hearings eviscerates the rule that the taxpayer must prove the exempt status of property. It argues that no remand is appropriate in this case because: (1) the taxpayers are held to know the legal criteria for exemption, (2) the taxpayers had an adequate opportunity to present evidence of exemption, and (3) the appellate record's deficiencies are attributable to the insufficient proof offered by the taxpayers before the Board.[7]

█ We hold that the superior court properly remanded the issues. Even without express statutory authority, courts may remand a case to an administrative agency for additional investigation when equity requires.[8] *Ford Motor v. National Labor Relations Board*, 305 U.S. 364, 373,

---

5. The parties appeal exemption determinations for numerous lots with varied uses. Some lots and buildings have multiple uses. The location of the uses is not clearly established in the record. For easier reference, the superior court assigned a descriptive name for each use, *e.g.,* the "White House." The court determined the exemptions according to use, not specific property location. We adopt the superior court's classification system. On remand the churches must prove the location of each exempt use. *See infra* note 17.

6. *E.g.,* here, the *de novo* review of the administrative *record. See supra* note 3.

7. The Lutherans and Methodists also oppose the remand. They claim that no "facts" are disputed and that the City cannot provide procedural due process. As explained previously, the superior court's decision raised *new* issues for factual resolution. We will not consider the due process argument since the parties did not raise it below. *Williams v. Alyeska Pipeline Serv.*, 650 P.2d 343, 351 (Alaska 1982).

8. Thus, we need not decide if AS 44.62.570, an Alaska Administrative Procedure Act section defining a superior court's power to remand certain administrative adjudications, applies to board of equalization tax exemption cases.

59 S.Ct. 301, 306, 83 L.Ed. 221, 229–230 (1939).

■ The record here reveals that the Board itself misconceived the applicable exemption laws. The Board actually awaited judicial clarification of the legal "mess" it perceived. Given the Board's own confusion, the churches lacked notice of the legal criteria for exemptions. After clarifying those criteria, the superior court correctly exercised its equitable power to remand portions of the case to allow the churches to submit additional evidence.

The City's concern that remand eviscerates the churches' burden of proof, giving them an undeserved second chance, is misplaced. A taxpayer claiming a tax exemption must always show the eligibility of its property for the exemption. *See* discussion *infra* section IV. Here, remand allows the churches to establish facts that are only now known to be relevant to these proceedings. The burden of proof is unaltered. The superior court stated expressly that the churches bear the burden of proof upon remand.

Thus, we affirm the superior court's remand orders.[9] We consider the validity of the exemption criteria adopted by the superior court—the substantive legal determinations that created the need for the remand—in the remainder of this opinion.

### B. *Standing*

■ The City contends that the Methodist owners waived their right to apply for tax exemptions for certain properties and thus lack standing to appeal the denial of those exemptions. The original applicants for the exemptions were tenants of the Methodist owner group, and not the group itself. Thus, the City argues that the *group* did not timely file for the exemptions and cannot now appeal the denial of

those exemptions. We conclude that the Methodists have standing.

The process by which the "claimant" must file for a property tax exemption is prescribed in AS 29.53.020(f). The statutory scheme does not define "claimant." We note, however, the flexibility of the property tax assessment procedure. The system allows any person having an interest in the property to be listed on the assessment records with the owner, AS 29.53.100(b), to advise the assessor of errors or omissions, AS 29.53.120, and even to appeal alleged valuation errors, AS 29.-53.130. Any agent or assigns of a person whose name appears on the assessment role may also appeal an alleged valuation error, AS 29.53.130.[10] Moreover, the form application for tax exemptions prescribed by the City Assessor appears to allow persons other than the owner to file the application.

We conclude that the term "claimant," as used in AS 29.53.020(f), includes any person having an interest in the property to be exempted, or such person's agent or assigns. This interpretation is consistent with the statutory scheme's flexibility and will not inconvenience the City Assessor. Here, therefore, the tenants properly claimed the Methodists' exemption because they were the Methodists' agents. Having timely applied, the tenants preserved the Methodists' standing to appeal the exemption denial.

### C. *Stay of Taxes*

The City argues that the superior court erred in permitting the Lutherans and Methodists a stay of payment of taxes during the appeal of this case.[11] The Lutherans and Methodists received a stay of the City's tax assessment for each of the four disputed tax years during the appeal of

---

**9.** Similarly, this court may remand the case to the superior court for its remand to the City for determination in accord with this opinion.

**10.** We do not decide whether AS 29.53.140 and AS 29.53.130, which define the appellate procedure for tax *assessments,* apply to denials of tax *exemptions. See supra* note 2.

**11.** The Lutherans and Methodists received a "stay of all foreclosure proceedings and all demands for future taxes on the subject property" pending appeal.

their case to the superior court. In return, they filed a supersedeas bond with the court for the principal amount of taxes due, *excluding* costs and interest. After the superior court issued a final judgment, it continued the stay during the appeal to the supreme court. Again, this was in exchange for a supersedeas bond.

The City argues that both AS 29.53.-390(a) and public policy require the payment of taxes under protest before any taxpayer may appeal an assessment. Even were a stay appropriate, the City claims that the court erred by failing to require that appellants' bond include costs and interest.

Our resolution of these issues is advisory only since this judgment terminates all pending stay orders in this case. We address them because of the public interest involved and the probability that they will continually evade review. *See, e.g., Doe v. State,* 487 P.2d 47, 53 (Alaska 1971).

■ Appellate Rule 603(2) governs the stay of an administrative agency's order while on appeal before the superior court.[12] *Pipeliners Union 798 v. Alaska State Commission for Human Rights,* 681 P.2d 330, 334 n. 8 (Alaska 1984). Because the City acted as an administrative agency in deciding the tax exemptions,[13] Rule 603(2) applies here.[14] Rule 603(2) allows a mandatory stay of appeals pending before the superior court by filing a sufficient and timely supersedeas bond. *Id.* at 335 n. 11. Rule 603(2) provides explicitly that the bond be conditioned for the full satisfaction of the appealed judgment, *including* interest and costs. Here, the supersedeas bonds were only for the principal amount of the taxes assessed, *excluding* interest and costs. Thus, the superior court improperly stayed the payment of taxes during its review.

Appellate Rule 204(d)[15] authorizes the superior court to stay certain judgments on appeal to the supreme court.[16] Rule 204(d) allows the superior court discretion to set the security required for a stay. Here, the superior court properly stayed its judgment pending this appeal.

## IV. PRELIMINARY ISSUES

Three principles of construction apply in deciding tax exemption cases:

■ 1. A taxpayer claiming a tax exemption must produce evidence sufficient to prove the property's eligibility for the exemption. *Sisters of Providence in Washington v. Municipality of Anchorage,* 672 P.2d 446, 447 (Alaska 1983).[17]

**12.** Alaska R.App.P. 603(2) provides in part:
*Stay Upon Appeal—Supersedeas Bond.* When an appeal is taken, the appellant may obtain a stay of proceedings to enforce the judgment by filing a supersedeas bond with the district court, or with the superior court in administrative appeals.... The bond shall be conditioned for the satisfaction in full of any judgment (including interest and costs) which may be given against the appellant by the superior court, or for satisfaction in full of the judgment (including interest and costs) of the ... [agency] if the appeal is dismissed. The bond shall comply with the provisions of Civil Rule 80.

**13.** *See supra* note 4.

**14.** We disagree with the City's contention that AS 29.53.390(a), which authorizes judicial review of a disputed tax assessment, requires payment of taxes before appeal. Even if that statutory provision were so interpreted, Appellate Rule 603(2) supercedes it. Appellate Rule 607 provides that the appellate rules "supercede all other procedural methods specified in Alaska

statutes for appeal from administrative agencies to the courts of Alaska."

**15.** Alaska R.App.P. 204(d) provides in part:
*Supersedeas Bond.* Whenever in a civil case an appellant entitled thereto desires a stay on appeal, he may present to the superior court for its approval a supersedeas bond which shall have such surety or sureties as the court requires.

**16.** To the extent Alaska R.Civ.P. 62(d) conflicts with Alaska R.App.P. 204(d), the appellate rule governs.

**17.** The City contends that exemptions for many Catholic properties must be denied because they did not establish the precise location of the allegedly exempt buildings.
Under AS 29.53.020(f), the City may require proof in any necessary form of the claimant's right to an exemption and the amount of such claim. The City could properly advise all taxpayers seeking exemptions that they had to pro-

■■■ 2. Statutes granting tax exemptions are narrowly construed. We expressed the fundamental policy behind this rule in *Greater Anchorage Area Borough v. Sisters of Charity of the House of Providence*, 553 P.2d 467 (Alaska 1976):

> All property is benefited by the security and protection furnished by the State, and it is only just and equitable that expenses incurred in the operation and maintenance of government should be fairly apportioned upon the property of all.

553 P.2d at 469 (quoting *Animal Rescue League v. Bourne's Assessors*, 37 N.E.2d 1019, 1021 (Mass.1941)).

■■■ 3. The canon of strict construction "is an aid to, not a substitute for, statutory interpretation; the interpretation must still be a reasonable one." *Sisters of Providence*, 672 P.2d at 447 (quoting *McKee v. Evans*, 490 P.2d 1226, 1230 n. 18 (Alaska 1971)).

With these general principles in mind, we turn to two issues that apply to the entire tax exemption scheme—"exclusive use" and apportionment.

### A. *"Exclusive Use" is Required*

■■■ All tax exemptions disputed in this case were sought under AS 29.53.020. This section exempts only those properties used "exclusively for" a tax exempt purpose.[18] We have interpreted "exclusive use" in accord with our rule of strict construction. In *Harmon v. North Pacific Union Conference Association of Seventh Day Adventists*, 462 P.2d 432 (Alaska 1969), we decided that "[e]ven when the uses of a piece of property are highly related to the primarily exempted activity, the exemption will not apply when the statute requires 'exclusive' use." 462 P.2d at 437. All uses of the property must be for the "direct and primary" exempt purpose. *Evangelical Covenant Church v. City of Nome*, 394 P.2d 882, 883 (Alaska 1964) (citing Annot., 154 A.L.R. 895, 898 (1945)). *See Matanuska-Susitna Borough v. King's Lake Camp*, 439 P.2d 441, 445 (Alaska 1968).. Thus, property used by a charitable organization to raise money for that group's charitable activities is not exempt since the property's direct and primary use is fund-raising and not charity itself. *See King's Lake Camp*, 439 P.2d at 445; *Evangelical Covenant Church*, 394 P.2d at 885. Furthermore, property occasionally used for a nonexempt purpose is not exempt since the property must be used exclusively for exempt purposes. *Evangelical Covenant Church*, 394 P.2d at 885.

---

vide a surveyed description of the allegedly exempt property. In this case, however, the proof required by the City was ambiguous throughout these proceedings. Thus we will not allow any confusion over the location of the buildings to destroy exemptions which are otherwise soundly established. On remand, the City may require the churches to submit additional evidence of the location of the property for each requested exemption. If a church then fails to meet the burden imposed, the City may properly deny that exemption.

18. AS 29.53.020 provides in part:

> *Required exemptions.* (a) The following property is exempt from general taxation:
>
> ....
>
> (3) property used exclusively for nonprofit religious, charitable, cemetery, hospital or educational purposes;
>
> ....
>
> (b) "Property used exclusively for religious purposes" includes the following property owned by a religious organization:
>
> (1) the residence of a bishop, pastor, priest, rabbi, minister or religious order of a recognized religious organization;
>
> (2) a structure, its furniture and its fixtures used solely for public worship, charitable purposes, religious administrative offices, religious education or a nonprofit hospital;
>
> (3) lots supporting and adjacent to a structure or residence mentioned in (1) or (2) of this sub-section which are necessary to convenient use;
>
> (4) lots required by local ordinance for parking near a structure defined in (2) of this sub-section.
>
> (c) Property described in (a) or (b) of this section from which income is derived is exempt only if that income is solely from use of the property by non-profit religious, charitable, hospital, or educational groups for classroom space.

■ Property need not be devoted exclusively to a single exempt purpose to meet the "exclusive use" requirement. If the property is used exclusively for any combination of religious, charitable or educational purposes, AS 29.53.020(a)(3) is satisfied. *See Ladies Literary Club v. City of Grand Rapids*, 409 Mich. 748, 298 N.W.2d 422, 425 (1980); *Young Women's Christian Association v. Baumann*, 130 S.W.2d 499, 502 (Mo.1939).[19]

■ Today, we acknowledge two very narrow exceptions to the "exclusive use" rule. The first excepts *de minimus* uses. We foresee, as have other courts, that application of the "exclusive use" rule could be "so literal and narrow that it defeats the exemption's settled purpose." *Association of the Bar of the City of New York v. Lewisohn*, 34 N.Y.2d 143, ·356 N.Y.S.2d 555, 560, 313 N.E.2d 30, 35 (N.Y.1974). We join the Utah Supreme Court in holding that an occasional "use of true minor import or a *de minimus* use will not defeat exemption." *Salt Lake County v. Tax Commission of Utah*, 658 P.2d 1192, 1194 (Utah 1983) (quoting *In re Loyal Order of Moose, # 259 v. County Board of Equalization*, 657 P.2d 257, 264 (Utah 1982)).

■ Second, we acknowledge an exception under AS 29.53.020(a)(3) for property used for purposes directly incidental to and vitally necessary for the exempt use of other property. In *King's Lake Camp*, 439 P.2d 441, we held that a camp used by children's organizations remained exempt even though user groups contributed to operational expenses. We concluded that "the receipt of income and rentals by appellee was incidental to and reasonably necessary for the carrying out of the primary charitable purposes of the camp." *Id.* at 445. In that case, the property itself was used exclusively for otherwise exempt purposes.

We have never held that *King's Lake Camp* exempts property for uses "incidental to and reasonably necessary for" ex-

empt uses on *other* properties. In *Harmon*, 462 P.2d 432, appellees sought to exempt buildings used for the residences of church administrators, teachers and visiting church staff members. The buildings were also used for counseling and church social gatherings. Such uses did not comply strictly with former AS 29.10.336 (repealed 1972). That section exempted only the residence of the "pastor, priest, rabbi, minister, or religious order." Nevertheless, appellees argued that the court should consider the property necessary to the efficiency of the organization claiming the exemption. *Id.* at 437. We declined and pointed out that this analysis was not "sufficient to overcome the precise terminology of our own statute or the more general policy of strict construction in interpreting tax exemptive laws." *Id.* at 438. Moreover, in *Harmon*, the disputed property was not used directly with other exempt uses. Rather, it was merely used to further the general purposes of an organization engaged in other exempt activities.

After *Harmon*, we rejected the "incidental to and reasonably necessary for" extension in a much closer case, *Sisters of Charity*, 553 P.2d 467. In that case, the Sisters of Charity, a longtime health care provider in Alaska, sought to exempt space in their building adjacent to Providence Hospital. They rented the disputed space to doctors with hospital staff privileges to use as private office space. While we acknowledged that such office space use by the doctor-tenants incidentally benefited the hospital and its patients, we denied the exemption because the space was not used exclusively for hospital purposes. *Sisters of Charity*, 553 P.2d at 470. We distinguished a California case, *Cedars of Lebanon Hospital v. Los Angeles County*, 35 Cal.2d 729, 221 P.2d 31 (1950). That case exempted living quarters for resident doctors and hospital employees. We held that the questioned uses in *Cedars of Lebanon* were "institutionally necessary." *Sisters of Charity*,

---

**19.** We note that the combination of one exempt use with another could destroy the integrity of each. That situation, however, is not before us.

553 P.2d at 470. We distinguished *Cedars of Lebanon* for the same reason in *Harmon*, 462 P.2d at 438.

In sum, we acknowledge that property may be exempt under AS 29.53.020(a)(3) if the taxpayer establishes that the use of that property is *directly* incidental to and *vitally* necessary for the exempt use of other specifically identified property. Similarly, property used part-time for exempt purposes and otherwise for uses directly incidental to and vitally necessary for the exempt purposes is exempt. We will strictly construe this extension.

### B. *Spatial Apportionment is Required*

■ The "exclusive use" requirement means that property cannot be apportioned by *time* into exempt and nonexempt uses. The City believes that, except for religious residences,[20] property cannot be apportioned by *space* into exempt and nonexempt portions. It bases its argument on the statute's use of the specific words "structure" and "lots" to describe exempt property. The superior court held that spatial apportionment is proper, and we agree.

The question is one of first impression for this court. Previous appellants have used but never litigated spatial apportionment. *See Sisters of Charity*, 553 P.2d at 468–69; *Sisters of Charity v. Greater Anchorage Area Borough*, 8 Alaska L.J. 272, 273 (Nov. 1970). Although the City's reading of the statute is reasonable, it conflicts with the Alaska Constitution, art. IX, § 4. This section states:

> All, *or any portion of,* property used exclusively for nonprofit religious, charitable, cemetery, or educational purposes, as defined by law, shall be exempt from taxation.

(Emphasis added). Minutes from the Constitutional Convention shed the determinative light on this provision:

> [T]he intent of the Committee [on Finance and Taxation] here is to allow for tax exemptions on property used for religious, charitable, cemetery, or educational purposes, to be exempt from taxation, but to provide for taxation of income-producing property, and furthermore, to allow for proration of such income-producing property. For example, if a religious organization should own an office building, a part of which is rented out, a part of which is used for its own purposes, the intent here is to allow the taxation of the income-producing part of that office building and exemption on the non-income producing part.

2 Proceedings of the Alaska Constitutional Convention 1112 (December 19, 1955). We conclude that the "[a]ll, or any portion of, property" language of art. IX, § 4 mandates the spatial apportionment of all property into exempt and nonexempt portions. Because we must construe a statute as constitutional when reasonable to do so, we hold that AS 29.53.020 mandates spatial apportionment of applicable "property," "residences," "structures," and "lots." [21]

### V. RELIGIOUS RESIDENCES

All property owned by a religious organization and used as "the residence of a bishop, pastor, priest, rabbi, minister or religious order of a recognized religious organization" is exempt from property taxation under AS 29.53.020(b)(1). The parties raise five issues about this statute: 1) May a single parish contain more than one exempt residence? 2) May the residence of an assistant pastor be exempt? 3) Must a pastor be committed exclusively as a clergyman for a local congregation to have an exempt residence? 4) Is the residence of a religious worker not listed in AS 29.53.020(b)(1) exempt? and 5) Is the residence of a religious order's members exempt although it is not the order's monastery or motherhouse?

20. The apportionment of structures to exempt the space used as religious residences is not before us. The City concedes that statutes require such apportionment.

21. Because spatial apportionment between exempt and nonexempt uses is required within each building and lot, we discuss the exemption determinations in terms of the property's use, rather than location.

We have twice considered the tax status of religious residences. Each time, a different statute was in effect. In *Evangelical Covenant Church*, 394 P.2d 882, 885, the statute then in effect exempted property "used for religious purposes." The statute defined these "purposes" to include "the residence of the pastor, priest, or minister of a religious organization, *and other property of the organization not used for business rent or profit.*" *Id.* (footnote omitted; emphasis in original). We held that despite the language exempting the residence of *the* pastor, the residence of an "assistant or lay pastor" was also exempted by this "broadened tax exemption [provision]." *Id.* We also doubted whether " '[t]he almost universal rule ... that each church congregation has but one pastor' ... can be said to have any place in this day and age when many a church congregation is ministered to by more than one pastor." *Id.* at 886 n. 15 (quoting *Griswold v. Quinn*, 97 Kan. 611, 156 P. 761, 762 (1916)).

An amendment replaced the statutory language relied upon in *Evangelical Covenant Church* with a list of exempt uses of property owned by religious organizations. This list was similar to the present statute's list.[22] In *Harmon*, 462 P.2d 432, we determined that this legislative change narrowed the "residence" exemption. We denied exemptions for the residences of two ministers who were both local assistant pastors and statewide administrators. We also held nonexempt the residence of a parochial school principal. We stated that "the words '*the* residence of *the* pastor,' ... imply that only those residences may qualify that have some direct relationship to a structure used primarily as a house of worship. If the legislature desires a broader form of exemption, it may amend the statute." *Id.* at 439 (emphasis in original; footnote omitted).

While we worded the *Harmon* test in terms of the relationship of the *residence* and the house of worship, the relationship between the *inhabitant* of the residence and the house of worship concerned us most. Thus, the minister—administrators' residences were not exempt since they were used by persons whose work was not exclusively and directly related to the local house of worship and associated congregation. In *Harmon* we left undecided whether the new statute exempted only one pastoral residence per congregation. *Id.* at 439 n. 3.[23]

### A. May a Single Parish Contain More Than One Exempt Residence?

■ The superior court concluded that the present wording of AS 29.53.020(b)(1) allows a single parish to contain more than one exempt residence. We agree. Years ago, we recognized that many church congregations have more than one pastor and that an exemption of more than one pastoral residence would be reasonable. *Evangelical Covenant Church*, 394 P.2d at 886 n. 15. Today's statute accommodates this reality. We note particularly that the current statute exempts "a" pastor's residence instead of the previous exemption for "the" pastor's residence. Thus, the superior court properly exempted the residences of two assistant Catholic pastors, although this allowed more than one exempt residence per parish.

### B. May the Residence of an Assistant Pastor be Exempt?

■ The City maintains that several properties are nonexempt because they were residences of "assistant" pastors. The superior court disagreed, holding that an assistant pastor's residence is exempt "as long as it has some direct relationship

---

22. The "residence" segment of the list read: "the residence of the pastor, priest, rabbi, minister, or religious order, which residence is owned by a recognized religious organization." *Harmon*, 462 P.2d at 436.

23. Since *Harmon*, the "residence" exemption was amended. It now exempts: "the residence of *a bishop*, pastor, priest, rabbi, minister or religious order of a recognized religious organization." AS 29.53.020(b)(1) (amendments emphasized).

to a structure used primarily as a house of worship."

We agree with the superior court insofar as it held that sometimes an assistant pastor's residence may be exempt. The label "assistant" does not preclude the exemption. As we have held today, a congregation may have more than one exempt residence and an "assistant" may perform essentially the same functions as "the" pastor.

### C. Must a Pastor be Available and Committed Exclusively As a Clergyman For a Local Congregation In Order To Have An Exempt Residence?

The parties dispute exemptions for three assistant pastor residences. The City urges that these are nonexempt unless a pastor is available and committed exclusively as a clergyman for a local congregation.

Two pieces of Catholic property are involved. One is the "Assistant Pastor Apartment." [24] Father Grief resided in this apartment during tax years 1979 through 1982. At that time, Father Grief, an ordained priest, was an assistant pastor of the St. Joseph's Church. He spent approximately one third of the year doing pastoral work in the villages, one half of the year in Nome doing pastoral work for both the villages and the Catholic Bishop, and the summer months outside Alaska. The other property was that part of St. Joseph's Rectory where Father Poole resided during the tax years 1981 and 1982. In those years, Father Poole served both as an assistant pastor of St. Joseph's Church and as radio station KNOM administrator.

The third property involved was the "Lutheran Parsonage." Pastor Mark Houglum and his family resided there in tax years 1979 and 1980. The American Lutheran Church had sent him to operate the Arctic Christian Training School. This school provides leadership education among Native people within the congregation of Our Savior's Lutheran Church. In 1979, Pastor Houglum also assisted pastors in outlying villages and the pastor of Our Savior's Lutheran Church through preaching and other services. In 1980, Pastor Houglum continued his work half-time as assistant pastor of Our Savior's Lutheran Church and half-time as Director of the Arctic Christian Training School. In that year, the church had no other pastor. Pastor Houglum was also Director of Eskimo Ministries.

The superior court reversed the exemption denials for these three properties and remanded some determinations for reconsideration. It exempted these residences because they have "some direct relationship to a structure used primarily as a house of worship."

We affirm the superior court's judgment but for different reasons. Under *Harmon*, the three disputed residences would not have been exempt. *Harmon* exempted only residences of religious leaders whose work exclusively and directly related to a local house of worship and an associated congregation. None of the three assistant pastors here were committed exclusively as clergymen for a local congregation.

Today, however, we reject *Harmon's* exclusivity test. The present religious residence exemption statute reflects the legislature's intent to broaden the exemption beyond the residences of spiritual leaders whose work *exclusively* relates to a house of worship. We based our narrow "exclusivity" test in *Harmon* on the words *"the* residence of *the* pastor," and suggested that the legislature amend the statute if it desired a broader exemption. 462 P.2d at 439. Apparently the legislature took our suggestion, for the "residence" segment of the religious purposes list now reads "the residence of *a* bishop, pastor, priest, rabbi, minister or religious order of a recognized religious organization." AS 29.53.020(b)(1) (emphasis added). This small change is significant here since *Harmon* explicitly suggested this very change.

---

**24.** The "Assistant Pastor Apartment" consisted of 17% of a building on Lot 37.

Thus, we hold that the post-*Harmon* amendment of AS 29.53.020(b)(1) broadened the "residence" exemption. The statute now exempts the residence of a pastor who is primarily a spiritual leader but who may also be responsible for other church-related activities. This broadening of the exemption permits a practical application to small congregations unable to afford or utilize a full-time spiritual leader.

We conclude that Father Grief's residence (the "Assistant Pastor Apartment," 1979–82) is exempt because Father Grief was an assistant pastor of St. Joseph's Church and did pastoral work in the neighboring villages. Father Poole's residence (part of St. Joseph's rectory, 1981–82) is exempt because Father Poole was a spiritual leader of St. Joseph's Church. His dual role as administrator of his church's exempt radio station does not preclude the residence exemption. Finally, Pastor Houglum's residence (the "Lutheran Parsonage," 1979–80) is exempt because Pastor Houglum did pastoral work for the congregation of Our Savior's Lutheran Church and for outlying villages. His additional role as director of two pastoral organizations does not bar the exemption.[25]

D. *Is the Residence of a Religious Worker Not Listed in AS 29.53.-020(b)(1) Exempt?*

A specific and inclusive list of exempt residences is delineated in AS 29.53.-020(b)(1). We agree with the superior court that the policy of strict construction

and the *Harmon* decision necessarily makes nonexempt the housing for seminary students, church volunteers and visiting pastors.[26] Nothing in the post-*Harmon* amendment of AS 29.53.020(b)(1) suggests a legislative intent to change the inclusiveness of the exempt residences list.

We disagree with the superior court's holding that the portion of the Methodist Parsonage used for housing church volunteers during tax years 1979–82 was not exempt under the "residence" exemption. The Methodist Parsonage occupies part of a large structure accommodating a wide variety of church activities. The church set aside the parsonage to house the pastor and his family. Without more, this parsonage would be exempt as the "residence" of a pastor. The pastor's choice to allow volunteers or other guests to live in his home does not destroy the exemption. Housing guests is a use ordinarily associated with a person's residence, and the rule should be no different for a pastor's residence. Thus, we reverse the superior court's denial of the exemption for the portion of the Methodist Parsonage used for housing church volunteers during tax years 1979–82, and remand for apportionment.[27]

E. *Is the Residence of a Religious Worker Not Listed in AS 29.53.-020(b)(1) Directly Incidental to and Vitally Necessary for the Use of Other Exempt Property?*

Residences that are not exempt under AS 29.53.020(b)(1) may still be exempt

25. The City did not dispute the superior court's holding that the Lutheran Residence (tax year 1979) was exempt as the pastor's residence. The superior court remanded for apportionment. We affirm.

26. Affected are: (1) KNOM studio housing (housed KNOM volunteers in tax year 1979 and a volunteer cook and volunteer nurses in tax years 1980–82); (2) Manager Apartment (housed KNOM radio station manager in tax years 1980–82); (3) Gleeson Hall volunteer residence (housed KNOM volunteers in tax years 1980–82); (4) Girls' Dorm (housed volunteer nurses, hygienist and KNOM volunteers in tax years 1979–82); (5) portion of St. Joseph's Rectory housing volunteers (housed KNOM vol-

unteers and served as dining room for all church personnel in tax years 1981–82); (6) that part of the White House housing KNOM volunteers (housed KNOM volunteers in tax year 1979); (7) Lutheran Residence (housed seminary student and visiting pastors in tax year 1980); and (8) Seaview House Apartment (housed volunteer carpenter and his wife in tax year 1979).

27. The City apparently did not dispute the superior court's exemption of the portion of the Methodist Parsonage used to house the pastor (tax years 1979–82). It challenged only the remand for apportionment. Since we uphold the remand for apportionment we affirm the superior court's holding.

if their use was directly incidental to and vitally necessary for the exempt use of other church property. AS 29.53.020(a)(3). *See* discussion *supra* section IV, A. The superior court questioned whether on-premises housing of KNOM personnel was incidental to and reasonably necessary for the accomplishment of KNOM's charitable purposes. It found that perhaps several radio-station operators must be available immediately to broadcast disaster warnings, evacuation instructions or civil defense messages. The court remanded the exemption determinations of certain properties for findings on this issue. We reverse.

The on-premises housing of KNOM personnel is exempt only if directly incidental to and vitally necessary for the accomplishment of KNOM's charitable purposes. While KNOM may some day be asked to broadcast instructions during a public emergency, this does not require housing volunteers year-round on church property near KNOM. Absolutely nothing in the record suggests that this was why the church housed the volunteers; rather, it seems that the volunteers received housing instead of pay.

Thus, we hold that the charitable exemptions are denied for the following properties housing KNOM volunteers: KNOM Studio Housing (1979); Manager Apartment (1980–82); Gleeson Hall Volunteer Residence (1980–82); that part of the Girls' Dorm housing KNOM volunteers (1979–82); that part of St. Joseph's Rectory exclusively used for housing KNOM volunteers (1981–82);[28] and that part of the White House housing KNOM volunteers (1979).

The superior court found that the remaining residences on the Catholic properties were nonexempt since not "incidental to and reasonably necessary for" the exempt use of other church property. We affirm these findings, albeit under the stricter test adopted in this opinion. *See* discussion *supra* section IV, A. The remaining Catholic residences were used primarily by nurses employed by the Norton Sound Regional Hospital; they donated their paychecks to KNOM for its operating expenses. The superior court commended their efforts but correctly ruled that their residence on church property was not directly related to or vitally necessary for the exempt use of other church property. Likewise, nothing in the record indicates that it was vitally necessary for a volunteer cook to live on church property. Therefore, we hold these properties nonexempt: KNOM Studio Housing (1980–82); that part of the Girls' Dorm housing nurses (1979–82); that part of the White House housing nurses (1979).

The superior court concluded without discussion that housing for the seminary student and visiting pastors was not vitally necessary for the operation of the Lutheran Church. We agree. Therefore, we hold the Lutheran Residence (1980) nonexempt. Finally, the Seaview House Apartment was provided to a carpenter and his wife during the carpenter's volunteer work constructing the Methodists' Young Center. The superior court concluded that the apartment's use in 1979 as a volunteer's residence was not vitally necessary for the operation of an exempt activity. We affirm this finding.[29]

---

**28.** The portion of the Rectory used as a dining area and relaxation space for church volunteers is not exempt since the residences of many of the volunteers are not exempt. While Father Mackey, whose residence *is* exempt, also uses these areas, the exemption must be denied because the property is not used exclusively for an exempt purpose.

We note that the superior court erroneously assumed that a "residence" must be located in one building. When bathing, sleeping, cooking or other essential facilities are located in differ-

ent buildings, all those facilities can be exempt under the "residence" exemption.

**29.** Any argument that these volunteers had to live on church property so that they could afford to contribute their salaries to the church lacks merit. Property loaned by the church in order for the church to raise funds or to save money on salaries is essentially used for fund raising. Fund raising is a nonexempt property use even if the money raised or saved is used for the church's charitable activities. *King's Lake Camp,* 439 P.2d at 445; *Evangelical Cove-*

F. *Is the Residence of Members of a Religious Order, Which is not the Order's Monastery, Exempt?*

 The residence of a "religious order of a recognized religious organization" is exempted under AS 29.53.020(b)(1). In a question of first impression for us, the parties dispute the definition of the "residence" of a religious order for purposes of the "residence" exemption.[30] The City argues that an order has only a single residence; this is the motherhouse, convent or monastery where the order is based. The Catholics argue that the residence of *any* community of an order's members is an order's residence.

The superior court held that a religious order resides wherever members of the order live together as a religious community apart from the secular community. The residence, however, must be more than the occasional living quarters of individual members of the religious order. The superior court cited *Midtown Church of Christ v. City of Racine*, 83 Wis.2d 72, 264 N.W.2d 281 (Wis.1978) in support of its definition. We disagree with the superior court's holding.

Strict construction leads us to conclude that a religious order has only a single residence; this is the motherhouse, convent or monastery where the order is based. Section 29.53.020(b)(1) exempts *"the* residence of a ... religious order...." (Emphasis added.) It does not exempt *all* residences of all members of a religious order

who dwell together while on a mission. A broader reading would be unworkable. While pastors and ministers must work primarily as spiritual leaders of a house of worship or congregation to have an exempt residence, brothers and nuns could perform any function anywhere and still qualify for a "residence" exemption.

We distinguish *Midtown Church of Christ*. That case interpreted a broader statute that exempted the residence of *"members of* religious orders and communities."* 264 N.W.2d at 284 (emphasis added). Our narrower construction is consistent with legislative intent: the final version of the legislation establishing the exemption specifically deleted references to "members of" religious orders.[31]

The Catholics sought exemptions for two parcels of property, the White House[32] and the Brothers' Trailer Residence,[33] under the residence exemption for "religious orders." The City denied a tax exemption for 1980 for the White House and the superior court reversed. The City also denied a tax exemption for the Brothers' Trailer Residence for tax years 1979–82, and the superior court again reversed.

We reverse the superior court's holdings regarding the White House and the Brothers' Trailer Residence. While these properties were homes for members of religious orders, they were not the residences of the orders themselves. Accordingly, we affirm the City's denial of exemption for the

---

*nant Church*, 394 P.2d at 885. *See also* discussion *infra* section VII, B.

30. Webster's Third New International Dictionary 1587 (1969) defines "order" here as "a religious body typically an aggregate of separate communities living under a distinctive rule, discipline, or constitution: a monastic brotherhood or society." The City does not dispute that the persons living on the disputed properties belong to a legitimate religious "order."

31. As originally proposed, H.B. 908, 9th Leg., 2d Sess. (1976) referred to the residence of "a member of a religious order of a recognized religious organization."

32. The White House sits on a large block of property owned by the Catholic Bishop and used only for the purposes of the Catholic

Church. Two sisters of the Congregation of the Most Holy Rosary, Adrian Dominican Sisters ("Sisters") resided there during tax year 1980. The Sisters performed ministerial work for St. Joseph's church in tax year 1980. They then left the state.

33. Three members of the Brothers of Christian Instruction ("Brothers") lived in the Trailer Residence during tax years 1979–82. The Brothers' Trailer Residence, like the White House, sits on the complex of properties owned by the Catholic Bishop and used by the Catholic Church. The Brothers lived together in the trailer and worked exclusively for St. Joseph's parish and KNOM.

White House (tax year 1980) and the Brothers' Trailer Residence (tax years 1979–82).

## VI. CHURCH SANCTUARIES, RELIGIOUS ADMINISTRATIVE OFFICES AND RELIGIOUS EDUCATION

■ The City denied exemptions for both the Our Savior's Lutheran Church building (tax years 1979–82) and the Community United Methodist Church building (tax years 1979–82). The superior court found that the City apparently believed that several uses within the buildings were not exempt and that spatial apportionment was not allowed. As a result of these misconceptions, the City would have wrongfully denied exemptions for any religious sanctuaries, religious administrative offices, and rooms for religious education contained within those buildings; these uses are all exempt under AS 29.53.-020(b)(2).[34] The superior court thus reversed these determinations and ordered the City to apportion the space within the buildings according to exempt and nonexempt uses.

The City argues that even with apportionment, no space within these buildings is exempt because the churches have not met their burden of showing that any space was used *exclusively* for exempt purposes. The City claims that the superior court erroneously presumed that such spaces existed and improperly remanded for apportionment.

We agree with the superior court's judgment. Since the determination and apportionment of exempt and nonexempt uses was not made previously, it remains an issue for remand. The churches bear the burden of proving entitlement for exemption. If no space was used exclusively as a sanctuary, religious administrative office,

or room for religious education, then the City may properly deny the exemptions.

## VII. PROGRAMS OPERATED BY THE CHURCH OWNER

The City denied exemptions for · three properties on which the churches operated programs for the general public. The programs included a Catholic radio station, a Methodist youth hostel and a Methodist thrift shop. The superior court reversed the City's decision on all three properties and remanded the case regarding the youth hostel and thrift shop for additional determinations. The City appealed these holdings. Two legal issues enter into this dispute: (1) What is a "charitable purpose"? and (2) When does payment for a service taint an otherwise exempt activity?

### A. *What Is a "Charitable Purpose"?*

All property used exclusively for "charitable purposes" is exempted under AS 29.-53.020 whether owned by a religious organization, AS 29.53.020(b)(2), or by some other person, AS 29.53.020(a)(3). Here, the churches could seek the "charitable purpose" exemption under either provision. We detect no sign that the legislature intended "charitable purposes" to have two different meanings or applications within one statute. "Charitable purposes" has the identical meaning and application in AS 29.53.020(a)(3) and AS 29.53.020(b)(2).[35]

This court has previously defined "charitable purposes". In *King's Lake Camp,* 439 P.2d 441, we interpreted it as used in former AS 29.10.336(a) (repealed 1972), the predecessor of AS 29.53.020(a)(3).[36] Recognizing that neither the constitution nor the general laws of this state defined the term, we resorted to the broad common law definition of "charity":

> It is quite clear that what is done out of good will and a desire to add to the

---

**34.** *See supra* note 18 for text of AS 29.53.-020(b)(2).

**35.** We thus disagree with the superior court's conclusion that "charitable purposes" as used in the context of AS 29.53.020(a)(3) refers to the types of charitable activity in which religious organizations would be expected to engage.

**36.** Former AS 29.10.336(a) declared exempt from taxation "all property used exclusively for nonprofit religious, charitable ... or educational purposes...."

improvement of the moral, mental, and physical welfare of the public generally comes within this meaning of the word 'charity.' To crowd out coarseness, cruelty, brutality from social man undoubtedly results in this betterment.

*King's Lake Camp,* 439 P.2d at 445 (quoting *Old Colony Trust v. Welch,* 25 F.Supp. 45, 48 (D.Mass.1938)).[37]

In *King's Lake Camp* we decided that a nonprofit camp used by nonprofit charitable and religious groups for a nominal fee, fulfilled a "charitable purpose" under former AS 29.10.336(a). We concluded that provision of recreational facilities, such as accommodations for campers, is a charitable use of the property. 439 P.2d at 446. We stated: "[i]n order to qualify as a charitable undertaking, it is not necessary that the beneficiaries of the charity be indigent or needy." *Id.*

While former AS 29.10.336(a) has since been amended and recodified as AS 29.53.-020(a)(3), the use of the term "charitable purposes" remains the same. Thus, the *King's Lake Camp* definition still applies.

B. *When Does Payment for a Service Taint What was Otherwise an Exempt Activity?*

Under AS 29.53.020(c),[38] otherwise exempt property which produces income is exempt only if that income derives solely from use of the property for classroom space.[39] We first interpreted the predecessor of this statute, former AS 29.10.336(c) (repealed 1972),[40] in *King's Lake Camp,* 439 P.2d 441. There we considered whether a nonprofit recreational camp was exempt as a charitable undertaking even though it charged user fees. The camp charged individual users $3.25 daily and group users $250 annually. Since these charges did not entirely defray the operational expenses of the camp, the camp owners accepted donations for that purpose. *Id.* at 443. We first determined that the camp operated exclusively for charitable purposes. We then held that it was exempt notwithstanding the fees because "the receipt of income and rentals ... was incidental to and reasonably necessary for the carrying out of the primary charitable purposes of the camp." *Id.* at 445. In addition, "such moderate user fees as were charged ... do not appear to have been inspired by a dominant profit motive." *Id.* We implicitly held that the fee accepted must not exceed the operational requirements of the exempt activity for which the payment is received. *Id.* at 444.[41]

Although the statute interpreted in *King's Lake Camp* has since been amend-

---

**37.** This definition clearly embraces the "humanitarian" rationale of charitable property tax exemptions. Exemptions are granted "as an aid or encouragement to individuals, corporations, or businesses, to do something supposedly for the good of the community at large, although such act is not itself a proper or even permissible function of the government." Holbrook & O'Neill, *California Property Tax Trends: 1850–1950,* 24 S.Cal.L.Rev. 252, 272 (1951).

**38.** *See supra* note 18 for text of AS 29.53.020(c).

**39.** This court has never resolved whether AS 29.53.020(c) requires that any income derived from otherwise exempt property be derived from use of that property "for classroom space," or if the "classroom space" limitation only applies to educational groups. As the textual discussion shortly shows, the *King's Lake Camp* opinion did not address the issue, 439 P.2d at 444. The superior court erroneously concluded that *King's Lake Camp* had addressed it. For two reasons, we conclude that "for classroom space" refers to income derived from any of the

listed groups' property. First, the plural term "groups" must refer to the entire list, and the phrase "for classroom space" modifies "property" used by any group in the list. Second, the alternative interpretation makes AS 29.53.020(c) tautological.

**40.** Former AS 29.10.336(c) provided that:

Property or part of the property described in (a) ... from which rentals or income are derived is not exempt from taxation under (a) of this section, unless the rentals or income are derived from the rental of the property by religious or educational groups for classroom space.

*See King's Lake Camp,* 439 P.2d at 442.

**41.** We distinguished *King's Lake Camp* from *Evangelical Covenant Church,* 394 P.2d 882. There, we denied exemption to a church-owned radio station that sold commercial air time to enterprises having no connection to the church and no affinity with any of its aims. Even though the funds generated may have been used

ed and recodified as AS 29.53.020(c), nothing suggests that the legislature intended to modify the *King's Lake Camp* test for deciding when payment for a service taints an otherwise exempt property use. In sum, property will not lose an exemption under AS 29.53.020(a)(3) even if payment is received for the use of the property if: (1) the property is used exclusively for exempt purposes; (2) the payment is not sought as a result of a dominant profit motive; and (3) the payment is both incidental to and reasonably necessary for the accomplishment of the exempt activity and does not exceed the operating costs of the exempt activity for which payment is received. If all of the above are met, the property does not lose its exemption on account of the income. If (3) is not met, the property is only exempt if used for classroom space.

## C. KNOM Radio Station

■ The Catholics seek to exempt the property on which KNOM radio station operates. They claim that the station is used exclusively for nonprofit religious, charitable, and educational purposes, and should be exempt under AS 29.53.020. The City denied the exemption for tax years 1979–82, and the superior court reversed. Because we conclude that KNOM was used exclusively for "religious purposes," [42] we affirm the superior court's judgment exempting KNOM.

KNOM is an AM radio station operated by the Catholic Bishop. The superior court found that it was operated to help the Alaska Natives maintain pride in their native culture and adapt to modern western society. In addition to broadcasting entertainment, sports, and news, KNOM's broadcasts included programs on religion, education, alcoholism, loss of identity, health, sanitation, transportation, Nome's economy, housing, juvenile problems, long-range planning and animal control. The superior court found that KNOM's four objectives were to educate, inform, inspire and entertain.

During the tax years for which the exemption was sought, KNOM's staff included two paid employees—one full-time and one half-time—and several full-time volunteers. It presented no commercial matter on its programs and neither solicited nor accepted advertising to pay for programming. KNOM did solicit donations to help pay its operating costs. While it acknowledged these over the air, it neither accepted them in return for commercial time, nor made any agreement with the donor regarding the announcement of sponsorship.[43]

The Catholics contend that KNOM has exclusively religious purposes. They argue that KNOM's goals are religious objectives, and that the amount of actual "religious" programming is irrelevant to KNOM's tax exempt status. They claim that all property used for religious purposes is statutorily exempt. They assert that the City's definition of the activities that are "religious" for taxation purposes excessively entangles government with religion in violation of the United States and Alaska Constitutions.

We do not question the legitimacy of KNOM as a church activity. The Catholics' analysis, however, fails to recognize that Alaska law does not exempt all religious activities conducted by churches. Rather, it limits the exemption to specific

---

to cover the operating expenses of the radio station, the radio station property itself was not directly and exclusively used for exempt purposes. *King's Lake Camp,* 439 P.2d at 445. *See* discussion *supra* section IV, A. Thus, in *Evangelical Covenant Church,* the "income" did not taint the exemption. The property was not exempt because it was not exclusively used for exempt purposes.

**42.** The superior court granted the exemption on different grounds.

**43.** The City claims that the superior court erroneously concluded that the station presented no commercial matter on its programs and that it neither solicited nor accepted advertising to pay for programming. We uphold the superior court's findings. Program sponsorship differs from commercial advertising because the former does not allow the use of radio time by the contributor.

religious activities. AS 29.53.020(b). If the Catholics cannot show that KNOM was used solely for "public worship, charitable purposes ... [or] religious education," under AS 29.53.020(b)(2), the KNOM property is not exempt as property used solely for religious purposes. Application of the statute to the churches' activities does not involve a subjective judgment about religiousness. Rather, it requires an objective decision that the property's use fits into one of the categories of exempted "religious purposes."

### 1. Is KNOM used exclusively for "public worship"?

KNOM airs less than five percent "public worship" programming. To demonstrate that KNOM is used solely for "public worship," the Catholics must show that KNOM's other programming was directly incidental to and vitally necessary for the effectiveness of the "public worship" programming. *See supra* section IV, A. The Catholics maintain that the other programming increases their listening audience. They assert that lengthy religious radio discussions are ineffective in the Nome area. Perhaps more people will listen to the religious programming if it is sporadically broadcast with entertainment, sports and news. But here, the religious worship is merely incidental to the nonreligious programming. Thus, our policy of strict construction prevents us from applying *King's Lake Camp* to KNOM. We do conclude, however, that KNOM was partially used for "public worship."

### 2. Is KNOM used for "religious education"?

We agree with the superior court that KNOM's programs on religion were for "religious education." AS 29.53.020(b)(2). As with the "public worship" exemption, however, KNOM was not used *solely* for "religious education." The vast majority of programming was secular entertainment, news and sports. These programs were not directly incidental to and vitally necessary for the "religious education" programming.

### 3. Is KNOM used for "charitable purposes"?

Aside from the programming for "public worship" and "religious education," we affirm the superior court's finding that the remaining KNOM programming is for charitable purposes. Under the broad definition of "charitable" established in *King's Lake Camp,* we agree that KNOM's objectives—to educate, inform, inspire and entertain—are charitable. The broadcasts on subjects such as education, alcoholism, loss of native identity, health and sanitation are "done out of good will and a desire to add to the improvement of the moral, mental, and physical welfare of the public generally." *King's Lake Camp,* 439 P.2d at 445 (quoting *Old Colony Trust,* 25 F.Supp. at 48). Much like the recreational camp exempted in *King's Lake Camp,* KNOM's entertainment programming is charitable; it is a "gift to a general public use, which extends to the poor as well as to the rich." *King's Lake Camp,* 439 P.2d at 446 (quoting Lord Camden, Eighteenth Century Chancellor of England).

In sum, we conclude that KNOM was used exclusively for "religious purposes" during tax years 1979–82 because it was used solely for a combination of "public worship," "religious education," and "charitable purposes." [44]

We agree with the superior court that the contributions received by KNOM do not taint KNOM's exemption. The limitations of AS 29.53.020(a)(3) regarding the receipt of income do not apply. In contrast to *Evangelical Covenant Church,* the contributions received are not in exchange for commercial air time, only for good will. Therefore, the KNOM station is used exclusively for exempt purposes. There are no allegations that the contributions are the

---

**44.** *See supra* section IV, A, where we explained that the "exclusive use" requirement allows a

combination of exempt uses.

product of a dominant profit motive on the Catholic Bishop's part or that the contributions exceed the station's operational requirements. Accordingly, we affirm the superior court's judgment.

### D. Youth Hostel

■ The Methodists operated a Youth Hostel in various parts of the Community United Methodist Church Building. The space used depended upon current need. Affiliated with the American Youth Hostels, this Youth Hostel provided low-cost housing for transients, visitors to Nome traveling cheaply and others who were neither needy nor traveling cheaply. It received donations ranging from $2.50 to $5.00 per night, although no one was turned away if fees were not paid. The church operated the Youth Hostel for charitable purposes and made no profit.

We agree with the superior court that the Youth Hostel was a charitable activity. The Youth Hostel closely parallels the camp operated for "charitable purposes" in *King's Lake Camp*. The Youth Hostel provides travelers temporary lodging for a low daily fee. Although some who stay at the Hostel are not needy and could pay more, no one is turned away if the fees are not paid. In this sense, the Youth Hostel is a gift to the general public.

The income from the Youth Hostel does not taint the hostel's exempt status. The fees were received as payment for the exempt hostel services, were related to and necessary for the hostel's operation, did not exceed the hostel's operating costs, and were not motivated by profit making. Thus, the income limitations of AS 29.53.-020(c) do not apply.

The superior court determined that the Youth Hostel was exempt for tax years 1979–82. It remanded the decision for apportionment. We uphold the superior court's judgment.

### E. Thrift Shop

■ The Methodists were denied an exemption for a Thrift Shop that they operated in part of the Community United Methodist Church Building (tax years 1979–82). The superior court reversed the exemption denial, and remanded for apportionment. The Thrift Shop distributes used clothing. The apparently slight income buys presents for prisoners, supports donations for mission projects and helps pay for the church's utilities. We agree with the superior court that provision of used clothing at prices affordable to the poor is a charitable activity under *King's Lake Camp*.

The superior court concluded that the shop's income did not taint its exemption. The court ruled that it was not the product of a dominant profit motive, and that the use of the income was incidental to and reasonably necessary for the accomplishment of the shop's charitable purposes. The small income was used for charitable projects and to help defray the church's utility costs. The superior court stated that "rare is the church that doesn't have some charitable activity to help needy people obtain food, clothing and shelter attended by rummage and bake sales, church bazaars and even bingo."

We disagree in part with the superior court's analysis. If the Thrift Shop raised money that was unnecessary to either the shop's operation or use by its other charitable activities, then the Thrift Shop would not be exempt under AS 29.53.020(c) even though it is otherwise a charitable activity. *King's Lake Camp*, 439 P.2d at 445; *Evangelical Covenant Church*, 394 P.2d at 885. The superior court did not determine this point. We thus affirm the superior court's decision to remand the Thrift Shop decision. But before apportioning, the City should determine whether the Thrift Shop is exempt under this opinion.

## VIII. CHURCH PROPERTY LEASED TO OTHER NONPROFIT ORGANIZATIONS

A number of exemption disputes in this case involve church properties that were rented, leased or offered under some other financial arrangement for use by other nonprofit groups. Affected are: (1) Kawe-

rak Head Start (tax years 1979–82); (2) Lutheran Residence: Bering Straits Treatment Center, Inc. (tax years 1981–82); (3) Community College (tax year 1979); (4) Nome Child Care, Inc. (tax years 1979–82);[45] (5) Young Center (tax years 1980–82); (6) Nome Receiving Home (tax years 1979–82); (7) Senior Citizens' Center (tax years 1979–82); and (8) Bering Sea Women's Group (tax years 1979–82).

We have twice examined the effect of a property lease on tax exemptions. *Sisters of Charity*, 553 P.2d 467, involved a nonprofit charitable and religious corporation that leased property adjacent to its hospital to doctors for use as private office space. *Id.* at 468. The commercially competitive rental rates never became significant on appeal. We never reached the application of AS 29.53.020(c) or *King's Lake Camp* because we concluded that the property was not used exclusively for exempt purposes.

To determine the "use" of leased property, we examined both the owner-lessor's and the lessee's uses. *Sisters of Charity*, 553 P.2d at 470–72. Because the private practice of medicine is neither a charitable nor a nonprofit medical enterprise, such use by the lessee made the property ineligible for exemption under AS 29.53.020(a). *Id.* at 472. Although locating the medical practitioners near the hospital incidentally benefitted the hospital, the benefit was not the primary purpose of the private practice of medicine. *Id.* at 470. We carefully pointed out that the owner-lessor was not obligated to provide the medical office space to accomplish its charitable purposes. *Id.* at 471 n. 12. *See supra* section IV, A.

In *Sisters of Providence*, 672 P.2d 446, we examined the opposite side of the leasing problem. That case involved an owner-lessor's leasing of the property for profit to a nonprofit hospital. We reiterated the *Sisters of Charity* rule that both the lessor's and lessee's uses must be considered in the exemption determination. *Id.* at 449.

We concluded that the lessor's leasing of the property for profit was not a "use" of the property for nonprofit hospital purposes. *Id.* at 451–52. As in *Sisters of Charity*, we did not reach the application of AS 29.53.020(c) or *King's Lake Camp*. Again, the property failed to meet the first exemption criterion because it was not used exclusively for an exempt purpose.

Thus, we have not yet decided a case in which a nonprofit charitable group leased its property at "charitable rates" for another group's exempt activity. Here, we are confronted potentially with eight such situations. We hold that the exempt status of the property turns on both the lessor's and lessee's uses of the property. The lessor's use depends upon the terms of the lease or rental agreement. We conclude that the *King's Lake Camp* analysis applies to leases and rents in the same way it applies to user fees and contributions.

■ In sum, property leased or rented is exempt if: (1) the property is leased or rented for an exempt activity; (2) the lease or rental payments are not the product of an owner's dominant profit motive; and (3) the lease or rental payments are incidental to and reasonably necessary for the exempt use of the property and do not exceed the operational requirements of the exempt activity. If (3) is not met, the property must be used for classroom space to be exempt.

The superior court applied a different analysis and affirmed the exemption denials. Thus, it did not make the determinations necessary to resolve the dispute for the eight properties involved. Therefore, we reverse the superior court's judgment and remand for resolution in accord with this opinion.

## IX. SUPPORT PROPERTIES

■ Having determined the categories of exempt property uses, we now consider exempt "support properties." Section 29.53.020(b)(3) exempts:

---

**45.** The Methodists claim that this property was exempted in 1979, but this is unclear from the record. If true, then that year's exemption is not on review and is not disturbed by this opinion.

lots supporting and adjacent to a structure or residence ... [used exclusively for nonprofit religious purposes] which are necessary to convenient use....

If the main property is not exempt under either AS 29.53.020(b)(1) or (b)(2), then section (b)(3) bars exemptions for property supporting the nonexempt property.[46] Section (b)(3) requires that the support property be adjacent to the structure it supports. The statute does not define "adjacent." We agree with the superior court's use of the common law definition provided in Black's Law Dictionary 38 (Rev. 5th Ed. 1979):

Adjacent. Lying near or close to; sometimes, contiguous; neighboring. *Adjacent* implies that the two objects are not widely separated, though they may not actually touch, *Harrison v. Guilford County*, 218 N.C. 718, 12 S.E.2d 269, while *adjoining* imports that they are so joined or united to each other that no third object intervenes. *Wolfe v. Hurley*, D.C.La., 46 F.2d 515, 521.

A. *KNOM-Related Properties*

The Catholics unsuccessfully sought to exempt several properties used with the KNOM Radio Station: (1) Radio Station Office (tax years 1979–82); (2) KNOM Heating Plant (tax years 1979–82); (3) Radio Station Storage (tax years 1979–82); (4) 21' × 137.5' Access Strip (tax years 1979–82); and (5) Radio Tower (tax years 1979–82). The superior court reversed the City's denials of these exemptions. It found that they support the exempt KNOM Radio Station. *See supra* section VII, C. We affirm the superior court.

Although labeled here for convenience as "support properties," the station office and tower are integral parts of the radio station. They are thus exempt under AS 29.-53.020(b)(2) without reference to the "support property" exemption. The KNOM heating plant, the radio station storage and the access strip all qualify as support properties. The heating plant included an electrical generator; both are "necessary to

convenient use" of the radio station and the other buildings on the Catholic Bishop's properties. The buildings in the complex are mostly exempt under this opinion; the heat or electricity provided to the nonexempt parts of the complex was *de minimus*. The use of both the station storage and the access strip are "necessary to convenient use" of the building housing the radio station. We thus agree with the superior court that the City erroneously denied a tax exemption to the KNOM-related properties for the designated tax years.

B. *Garage and Heating Plant*

The Catholics sought to exempt a Garage and Heating Plant. During tax years 1979–82, the building housed both a garage, workshop and tool storage for St. Joseph's Church.and KNOM Radio Station and a heating plant used by St. Joseph's Church, St. Joseph's Rectory and the Girls' Dorm. It sits on a lot adjoining the Church and the Rectory. The use of property for garage space, workshop, tool storage and heat are proper support functions under AS 29.53.020(b)(3). Both the KNOM Radio Station and the Church were exempt under AS 29.53.020(b)(2) during tax years 1979–82. In addition, most of the Rectory was exempt under AS 29.53.020(b)(1). Some of the property serviced by the Garage and Heating Plant was not exempt during the tax years 1979–82—*e.g.*, portions of St. Joseph's rectory used as a dining area for KNOM volunteers (tax year 1981–82) and the Girls' Dorm (tax years 1979–82). We cannot determine from the record whether use of the Garage and Heating Plant for nonexempt property is *de minimus* or can be spatially apportioned from exempt uses. Accordingly, we remand with instructions that the property receive an exemption for each year that its use as support of nonexempt property was nonexistent, *de minimus* or spatially apportionable.

C. *Quonset Hut*

For tax years 1979–82 the Lutherans sought to exempt a Quonset Hut. The Hut

---

**46.** *See supra* note 18 for text of AS 29.53.-020(b)(1)—(2).

sits on property adjacent to the Lutheran Parsonage on one side and Our Savior's Lutheran Church on the other. Both the Parsonage and Church were exempt during tax years 1979–82. The Quonset Hut housed a standby generator for both the Parsonage and Church. It also contained a shop area and storage used by the Church and four village congregations. The superior court concluded that the Quonset Hut qualifies as support property under AS 29.-53.020(b)(3). We agree and affirm the exemption of the Quonset Hut for tax years 1979–82.[47]

#### D. *Lutheran Garage*

For tax years 1979–82, the Lutherans sought to exempt a garage that housed vehicles used by the Lutheran pastors.[48] The superior court found that the garage was "adjacent" to and supporting property for the pastors' exempt residencies. The court thus granted a tax exemption. We affirm.

#### E. *KD Building*

The Methodists sought to exempt the KD Building for tax years 1979–82. The building adjoins the Community United Methodist Church Building property. During the disputed tax years it held storage for the Methodist Church, Nome Community Center, Inc., Methodist Thrift Shop, and nonprofit organizations such as the Boy Scouts. The superior court held that only that part of the KD Building used for storage by the Church and the Thrift Shop was exempt support property. The court remanded for apportionment.

We affirm the superior court's remand but give different guidelines. Storage space may be exempt as supporting proper-ty for other exempt property, or as a charitable use of the property in itself. If on remand the City determines that the Thrift Shop or the Young Center[49] are exempt, then storage space used for those activities is also exempt. While provision of free storage is not in itself a charitable activity, it may be a charitable activity depending on the recipient, the motive and the terms of the storage. On remand, the City should determine whether the provision of storage to the nonprofit groups was a charitable use of the property. In addition, it should consider that use of the KD Building for storage by a particular group or individual may be a *de minimus* use. Finally, the City must apportion the exempt use of the KD Building.[50]

#### F. *Lutheran Apartment*

The Lutherans sought to exempt the "Lutheran Apartment" for tax year 1982. The 775 square-foot apartment is located in Our Savior's Lutheran Church Building. The superior court found that in tax year 1982 it was used for storage and reversed the exemption denial. The court held that if the Lutherans established on remand that it was used for church storage, then it was exempt as supporting property.

The superior court erroneously overlooked the apartment's 1982 use as housing for visiting pastors and lay people. We have already established that the use of church property for housing visitors and volunteers is not an exempt "religious purpose." *See supra* section V, D. If the apartment was more than occasionally used for such housing, the *de minimus* exception would not apply and the apartment would be nonexempt. This and the storage determination must be decided on remand.

---

**47.** The City claims that no evidence in the record supports the superior court's presumption that the hut existed before 1980. We conclude that this presumption was not clearly erroneous since the Lutherans apparently applied for an exemption for the Quonset hut in 1979.

**48.** The Lutherans claim that the City granted this exemption in 1980. The record is unclear. If true, then the exemption for that year is not on review and is not disturbed by this opinion.

**49.** The Young Center was operated by the Nome Community Center, Inc.

**50.** The Methodists suggest that the building cannot be apportioned because no space is specifically allocated to any one person or group. If so, then possibly no part of the building is used exclusively for exempt purposes.

Accordingly, we affirm the superior court's remand order for the Lutheran Apartment (tax year 1982).

#### G. *Young Center Storage and Parking and Methodist Office Building and Garage*

For tax years 1980–82, the Methodists sought to exempt property used as the Young Center Storage and Parking area. The Methodists also sought to exempt the Methodist Office Building and Garage for tax years 1979–82. The latter was used by the Nome Community Center, Inc. to store equipment and vehicles. The superior court denied the exemption for both of these properties because it denied the exemption for the Young Center and the Nome Community Center, Inc.

Since we have reversed and remanded the superior court's judgment regarding the Young Center and the Nome Community Center, Inc., we do the same for the support properties. *See supra* section VIII. If the city exempts the Young Center or the Nome Community Center, Inc., then the Young Center Storage and Parking or the Methodist Office Building must also be exempt.

#### H. *Seaview House Storage*

For tax year 1979, the Methodists sought to exempt a portion of the Seaview House as support property. That part of the property stored equipment during the construction of the Young Center. The Seaview House was not exempt unless the property it supported was exempt.[51] Since the Young Center was only built in 1980, the portion of the Seaview House was properly held nonexempt. We affirm the superior court's decision regarding this portion of the Seaview House.

### X. CONCLUSION

A summary of our judgment in this case follows. We remand the entire case to allow the City to take evidence and make findings on the locations of each property use which we have held to be exempt. Only those property uses specifically remanded on substantive grounds, other than proof of location, are subject to the City's redetermination.

| I. Catholic Property | Superior Court | Supreme Court |
|---|---|---|
| A. KNOM Studio Building | | |
| 1. Radio Station (1979–82) | Granted (1979–82) | Affirmed (1979–82) (p. 890–891) |
| 2. Radio Station Office (1979–82) | Granted (1979–82) | Affirmed (1979–82) (p. 893) |
| 3. KNOM Studio Housing (1979–82) | | |
| a. 1979: housed KNOM volunteers | Remanded (1979), for determination of whether KNOM volunteer housing was necessary for operation of KNOM | Reversed and Denied (1979) (p. 885) |
| b. 1980–82: housed other volunteers | Denied (1979–82) | Affirmed (1980–82) (p. 885) |

**51.** The record is unclear whether the property on which the Young Center is located was exempted in 1979.

If it was exempt, it is unlikely and improper that the basis for the exemption was the Young Center since the Center was not yet built. Thus, even if the Young Center *property* was exempt for some reason, the Seaview house could not be exempt as support property for the *Young Center.*

| I. Catholic Property | Superior Court | Supreme Court |
|---|---|---|
| B. KNOM Heating Plant (1979–82) | Granted (1979–82) | Affirmed (1979–82) (p. 893) |
| C. Radio Station Storage (1979–82) | Granted (1979–82) | Affirmed (1979–82) (p. 893) |
| D. 21′ × 137.5′ Access Strip (1979–82) | Granted (1979–82) | Affirmed (1979–82) (p. 893) |
| E. Radio Tower (1979–82) | Granted (1979–82) | Affirmed (1979–82) (p. 893) |
| F. Tom Busch Residence | | |
| 1. Manager Apartment (1980–82) | Remanded (1980–82) for determination whether KNOM volunteer housing was necessary for operation of KNOM | Reversed and Denied (1980–82) (p. 885) |
| 2. Assistant Pastor Apartment (1979–82) | Remanded (1979–82) for determination of whether Father Grief had pastoral duties related to the local congregation | Reversed and Granted (1979–82) (p. 884) |
| G. Gleeson Hall Volunteer Residence (1980–82) | Remanded (1980–82) for determination of whether KNOM volunteer housing was necessary for operation of KNOM | Reversed and Denied (1980–82) (p. 885) |
| H. Garage and Heating Plant (1979–82) | Granted (1979–82) | Reversed and Remanded (1979–82) for exemption determination (p. 893) |
| I. Girls' Dorm (1979–82) | | |
| 1. Portion housing KNOM volunteers (1979–82) | Remanded (1979–82) for determination of whether KNOM housing was necessary for operation of KNOM | Reversed & Denied (1979–82) (p. 885) |
| 2. Portion housing other volunteers (1979–82) | Denied (1979–82) | Affirmed (1979–82) (p. 885) |
| J. St. Joseph's Rectory (1981–82) | | |
| 1. Portion used as Father Poole's Residence (1981–82) | Remanded (1981–82) for determination of whether Father Poole had pastoral duties related to local congregation | Reversed & Granted (1981–82) (p. 884) |

| I. Catholic Property | Superior Court | Supreme Court |
|---|---|---|
| 2. Portion used as KNOM volunteer housing (1981–82) | Remanded (1981–82) for determination of whether KNOM volunteer housing was necessary for operation of KNOM | Reversed & Denied (1981–82) (p. 885) |
| 3. Portion used as dining area for church volunteers (1981–82) | Remanded (1981–82) for determination of whether KNOM volunteer housing was necessary for·operation of KNOM | Reversed and Denied (1981–82) (p. 885 n. 28) |
| K. White House (1979–80) | | |
| 1. 1979: KNOM volunteer housing | Remanded (1979) for determination of whether KNOM volunteer housing was necessary for operation of KNOM | Reversed & Denied· (1979) (p. 885) |
| 2. 1980: Congregation of Most Holy Rosary, Adrian Dominican Sisters | Granted (1980) | Reversed and Denied (1980) (p. 886) |
| L. Brothers' Trailer Residence (1979–82) | Granted (1979–82) | Reversed (1979–82) (p. 886) |

| II. Lutheran Property | Superior Court | Supreme Court |
|---|---|---|
| A. Our Savior's Lutheran Church Building | | |
| 1. Lutheran Apartment (1982) | Remanded (1982) for determination whether it was used for church storage | Affirmed (1982) for determination of whether apartment use as housing was more than de minimis and to determine storage issue (p. 894) |
| 2. Kawerak Head Start (1979–82) | Denied (1979–82) | Reversed and Remanded (1979–82) for exemption determination under correct legal test (p. 891–892) |
| 3. Lutheran Residence (1979–82) | | |
| a. 1979: housing for "the" pastor | Remanded (1979) for apportionment | Affirmed (p. 884) |
| b. 1980: housing for seminary student and visiting pastors | Denied (1980) | Affirmed (1980) (p. 885) |

| II. Lutheran Property | Superior Court | Supreme Court |
|---|---|---|
| c. 1981–82: Bering Straits Treatment Center | Denied (1981–82) | Reversed and Remanded (1981–82) for exemption determination under correct legal test (p. 891–892) |
| 4. Community College (1979) | Denied (1979) | Reversed and Remanded (1979) for determination under correct legal test (p. 891–892) |
| 5. Lutheran Sanctuary Religious Administrative Offices and Religious Education (1979–82) | Remand (1979–82) for Apportionment | Affirmed (1979–82) (p. 887) |
| B. Lutheran Parsonage (1979–80) | Granted (1979–80) | Affirmed (1979–80) (p. 884) |
| C. Quonset Hut (1979–82) | Granted (1979–82) | Affirmed (1979–82) (p. 893–894) |
| D. Lutheran Garage (1979–82) | Granted (1979–82) | Affirmed (1979–82) (p. 894) |

| III. Methodist Property | Superior Court | Supreme Court |
|---|---|---|
| A. Community United Methodist Church Building | | |
| 1. Nome Child Care, Inc. (1979–82) | Denied (1979–82) | Reversed and Remanded (1979–82) for exemption determination under correct legal test (p. 891–892) |
| 2. Youth Hostel (1979–82) | Remanded (1979–82) for apportionment | Affirm (1979–82) (p. 891) |
| 3. Thrift Shop (1979–82) | Remanded (1979–82) for apportionment | Remanded (1979–82) for exemption determination under correct legal test and for apportionment (p. 891) |
| 4. Methodist Parsonage (1979–82) | | |
| a. Portion used to house church volunteers (1979–82) | Denied (1979–82) | Reversed and Remanded (1979–82) for apportionment (p. 884) |
| b. Portion used to house pastor (1979–82) | Remanded (1979–82) for apportionment | Affirmed (1979–82) (p. 884) |
| 5. Methodist Sanctuary, Religious Administrative | Remanded (1979–82) | Affirmed (1979–82) |

| III. Methodist Property | Superior Court | Supreme Court |
|---|---|---|
| Offices and Religious Education (1979–82) | for apportionment | (p. 887) |
| B. KD Building (1979–82) | Decision for entire building | |
| 1. Portion used for storage by non-church groups (1979–82) | Denied (1979–82) | Remanded (1979–82) for determination of exemption of the Thrift Shop and Nome Community Center, Inc., application of the de minimus exception, and apportionment. (p. 894) |
| 2. Portion used for storage by church for church activities (1979–82) | Remanded (1979–82) for apportionment | (same as above) |
| C. Young Center (1980–82) | Denied (1980–82) | Reversed and Remanded (1980–82) for determination under correct legal test (p. 891–892) |
| D. Young Center Storage and Parking | Denied (1980–82) | Reversed and Remanded (1980–82) for exemption determination of the Young Center (p. 895) |
| E. Block 53, Lot 5 (N. 70') and Lot 6 (N. 68') | | |
| 1. Nome Receiving Home (1979–82) | Denied (1979–82) | Reversed and Remanded (1979–82) for determination under correct legal test (p. 891–892) |
| 2. Senior Citizens' Center (1979–82) | Denied (1979–82) | Reversed and Remanded (1979–82) for determination under correct legal test (p. 891–892) |
| 3. Methodist Office Building and Garage | Denied (1979–82) | Reversed and Remanded (1979–82) for exemption determination of the Nome Community Center, Inc. (p. 895) |
| F. Bering Sea Women's Group (1979–82) | Denied (1979–82) | Reversed and Remanded (1979–82) for determination under correct legal test (p. 891–892) |
| G. Seaview House (1979) | | |
| 1. Seaview House Apartment (1979) | Denied (1979) | Affirmed (1979) (p. 885) |
| 2. Seaview House Storage (1979) | Denied (1979) | Affirmed (1979) |