Charles NASH, Appellant,

v.

**MATANUSKA–SUSITNA BOROUGH, Appellee.**

No. S–13048.

Supreme Court of Alaska.

Sept. 3, 2010.

---

Peter R. Ehrhardt, Kenai, for Appellant.

John Aschenbrenner, Deputy Borough Attorney, Shannon Bodalay, Assistant Borough Attorney, and Nicholas Spiropoulos, Borough Attorney, Palmer, for Appellee.

Before: CARPENETI, Chief Justice, FABE, WINFREE, and CHRISTEN, Justices.

*OPINION*

CARPENETI, Chief Justice.

## I. INTRODUCTION

After a borough terminated a timber sale contract with a forester, the forester appealed first to the local board of adjustment and appeals and then to the superior court. Both upheld the Borough's termination of the contract. The forester now appeals to this court, claiming that the board hearing violated his right to due process by denying him the ability to call witnesses. The forester also claims the timber sale contract was improperly terminated. Because we find that the board hearing did not provide a full and fair opportunity for the forester to be heard, we agree that the hearing did not comport with due process. Accordingly, the forester was entitled to a trial de novo on his contract claims in the superior court. We therefore remand the case to the superior court.

## II. FACTS AND PROCEEDINGS

### A. Facts

#### 1. Timber sale contract between Borough and Nash

On September 25, 1998, the Matanuska–Susitna Borough (Mat–Su or MSB) Assembly

entered a timber sale contract with Charles Nash, under which Nash would harvest timber in the Chijuk Creek Forest. Nash agreed to pay the Borough $20.56/acre harvested and to harvest at least 1,000 acres per year during the contract period, which extended from July 1, 1999 through June 30, 2008.

Before Nash began working, the Alaska Department of Fish and Game issued a notice of violation to the Borough on December 2, 1998, charging that the Borough had violated state law in the manner in which it had previously built some stream crossings on Oilwell Road—the access road to the timber Nash was to harvest. The U.S. Army Corps of Engineers also issued a notice of violation regarding the same stream crossings.

To resolve the road situation in light of the stream crossing violations, Nash attended a February 18, 1989, meeting between officials of the MSB Department of Public Works, the Upper Susitna Soil and Water Conservation District, and the Corps of Engineers. The parties decided that "work for the violations would be the borough's responsibility and work needed for logging trucks would be the responsibility of Charlie Nash." Although construction and maintenance of roads to the harvest area was Nash's responsibility under the original timber sale contract, Nash claims that the "Road Agreement" added to his responsibilities or at least changed the scope of his contract. Indeed, Nash claims that his construction of 11 miles of all-weather road made up the largest part of his $1.5 million investment in the Chijuk timber project.

## 2. Events leading to MSB's termination of the contract

Shortly after the Oilwell Road Agreement, Nash requested, and was given, permission to reduce the contract's timber harvest requirements so that he could work on the road. In his request, Nash stated: "I need to get going on reconstructing the road for the Chijuk Sale. By way of this agreement, I would correct the problems that are open issues with Fish and Game." He added: "It's a good deal for the Borough. In order to accomplish this work, I'm going to need a roll

back in the first year's total harvested acres from 1,000 to 500."

Still, Nash did not meet even the reduced goal of 500 acres harvested in the first year—in fact, he did not harvest any timber before June 30, 2000. He had, however, largely completed work on two important bridges and was preparing to do other work on the road. On June 28, 2000, Nash requested a second change to the timber sale contract in the form of an extension of time for harvesting the first 500 acres until September 30, 2000. The Borough manager approved the request.

In August 2000 it became apparent that Nash would not meet the new deadline and a third accommodation would be necessary. In recommending approval of an extension, borough staff noted that the road being built was "very good," and that because of the quality of the road construction it was in the Borough's best interest to grant Nash the additional time he requested to complete the construction of Oilwell Road and harvest his timber. On November 16, 2000, the Borough approved the third amendment of the contract, providing that Nash would harvest 500 acres by January 31, 2001, and an additional 1,000 acres by June 30, 2001, and every contract year thereafter.

By January 15, 2001, Nash had fully completed the bridges, prepared the access road from the Moose Creek Bridge to the Kroto Creek Bridge, and begun to cut some trees. However, his progress was still not up to the contract's requirements, and on January 31, 2001, the Borough approved a fourth amendment pushing back the date for the harvest of the first 500 acres to February 28, 2001.

However, Nash still did not meet his requirements, and on June 25, 2001, the Borough officially notified Nash that he was in breach of the timber sale contract. Eventually, the fifth amendment to the contract and all subsequent ones were issued under a notice of breach—that is, the extensions allowed Nash to continue harvesting timber, but did not relieve him of being in breach of contract. Ultimately the Borough would approve eight amendments under breach, bringing the total contract amendments to 12.

Nash claims to have completed work on the road during the summer of 2001. Meanwhile, he subcontracted with RK Custom LLC to help him log and mill the timber. RK actively logged the area, and appears to have been responsible for much of the logging that was completed. However, relations between Nash and RK eventually broke down to the point that RK exercised an option in its contract with Nash, granting RK an assignment of part of the timber sale. Nash had granted the option to RK earlier, as capital to collateralize a loan for sawmill equipment. RK noted that it had no other recourse but to take this assignment because Nash "continues to fail at meeting production levels as outlined in all agreements."

On February 11, 2002, the Alaska Division of Forestry sent Nash a letter reminding him that he had failed to submit a required annual operations plan. The division also informed him that he would be in violation of the State Forest Practices Act if he did not remove felled white spruce that was piled along the logging roads by June 1, 2002. The state was concerned that downed logs could facilitate the spread of the spruce bark beetle, but Nash had stopped removing the logs in January pursuant to borough order because he had not submitted certificates of insurance for his contractors.

Nash provided a certificate of insurance around February 22, but was ordered to cease all activity on February 28, 2002, because he had not provided the Borough with a notice of operations (as required by the contract when operations resumed after a shutdown). Nash provided the required notice on March 6, 2002.

Another factor delaying removal of the felled logs was the closure of Oilwell Road during spring breakup in 2002 due to washouts. Unusual weather, including a heavy April 18 snowstorm, appear to have made road conditions unusually bad that spring. Nash claimed before the board of adjustment and appeals that the delay in reopening the road "caused us great hardship because we missed the normal June and early July markets for spruce sales to local mills."

On July 8, 2002, the Alaska Division of Forestry informed the Borough that failure to remove the logs by October 24 would constitute a violation of the Forest Practices Act. By letter dated July 22 the Borough informed Nash that he should take out downed logs. Borough staff estimated there were about 2,000 logs in Nash's portion of the sale area needing removal. Nash told the board of adjustment and appeals that he then "started hauling right away," but he found the "original 6 1/2 miles of road that is fully maintained by the Borough (the portion that extends from Petersville Road to the Moose Creek Bridge) [to be] in awful condition."

On July 31, 2002, Nash filed a new operating plan stating that his initial focus would be on hauling downed logs rather than harvesting. The Borough responded that this plan did not meet the contractual requirements because it did not provide sufficient detail of planned operations. Accordingly, the Borough would not approve any activities other than removal of the fallen spruce logs.

On September 12, 2002, MSB issued Nash and RK a notice of termination stating that the contract had been breached both with regard to removal of downed logs and failure to meet harvest level requirements. This letter stated that RK and Nash had until October 22, 2002, to cure the breach by paying for and harvesting 400 acres and removing about 2,060 spruce logs. The letter indicated that "MSB is not inclined to grant any further extensions in order to cure the breach of this contract. The MSB has previously granted twelve (12) extensions in order to cure previous breaches."

On October 24, 2002, borough staff performed a "final inspection for contract termination." Staff inspected the sale area and noted that no new acres had been harvested since the September 12 notice of termination and that about 1,500 spruce logs remained on the ground. The next day, the Borough sent Nash and RK a notice of termination of the contract. It informed Nash that he was no longer authorized to enter the property for forestry work and must remove his equipment. The Borough subsequently removed some of Nash's equipment and demanded

payment of some removal charges before it would release it to him.

## B. Proceedings

### 1. Board of Adjustment and Appeals

Although the Borough's contract termination did not mention any administrative appeal process, Nash was concerned about meeting exhaustion requirements and therefore filed an appeal with the local board of adjustment and appeals. Both parties submitted briefing to the board on January 24, 2003.

Nash had hoped to present witnesses who could attest to the poor state of the Borough's portion of the road and to Nash's compliance with the Borough's downed timber requirements. In addition to those who would attend in person, Nash hoped to have one witness testify telephonically. In an affidavit, Nash states that when he inquired about having witnesses, the borough clerk told him that the board hearing would not provide a general forum for witness testimony, but "interested parties" could be heard at the hearing if they had previously testified before the planning and zoning commission. While the Board of Adjustment and Appeals usually handled appeals from the planning and zoning commission, Nash says that he explained that his "appeal" had had no prior proceedings and that therefore his proposed witnesses had not previously testified. Because the issue was important to Nash, he asked the clerk to ask the board chair if he could call witnesses on his behalf. On January 28 the clerk informed Nash that the chair had confirmed that witnesses could not testify at the hearing. It appears the decision was made by the chairman based on Mat–Su Borough Code 15.39.190, which provides that only "interested parties" may testify. That code allows exceptions, but they are discretionary.

Since witnesses were not allowed, Nash filed a motion on January 29 requesting oral argument by interested parties. He requested that he be allowed to call people to speak on his behalf as interested parties and that the board decide the matter before the board hearing so Nash could make arrangements for witnesses to take the day off work and travel to the hearing. Nash requested that the board postpone the hearing if it could not decide his motion before the hearing. Nash argued that the interested party requirement stemmed from the board's normal role of reviewing planning and zoning commission hearings and is misplaced in the contract review setting. Nash also pointed out that it would be unfair to those expecting to testify, and a violation of due process, not to know in advance who could and could not testify. Nash asked for a response by January 31, which was the deadline for interested parties to notify the board that they wish to speak.

Nash received no response to his motion, despite repeated calls to the clerk's office. In order to meet the board's advance notice requirement, he nonetheless faxed a list of five people who wished to speak as interested parties. Still he did not hear from the board; thus Nash did not know if the people whose names he had submitted could testify, and thus whether they should take the day off work to attend the hearing.

At the February 7, 2003, hearing, the board chair began by addressing the issue of interested parties. The board called the persons on Nash's list of interested parties, but only one person—Nash's father—was present. The board agreed to hear his testimony because Nash's father had invested in the project and was thus an "interested party."

When Nash was allowed to address the motion, he summarized his difficulty getting an answer from the board and the hardship imposed by requiring people to take off work and travel great distances to attend the hearing without any assurance they would be able to present testimony. He also stated that he had at least one witness who was not present but who was willing to testify telephonically. The Borough attorney argued that Nash had no standing to assert these hardships on behalf of others. Nash responded that he had never been told that potential witnesses had to apply personally. The board upheld the Borough's objection based on standing. Accordingly, none of the people Nash wished to testify had an opportunity to testify except his father.

However, one witness who was not on Nash's list, Billy Schuyler, supervisor for the Susitna Soil and Water Conservation District, was present and requested the opportunity to speak. Schuyler worked with Nash on Oilwell Road and could testify about whether the Borough made it impossible for Nash to perform under the contract. The board debated whether Schuyler should be able to speak, with the chair strictly opposed and the other board members willing to hear additional information. The board ultimately allowed Schuyler to testify as a special exception, in part because he had taken time off from work and driven on icy roads since 2:00 a.m. to attend the meeting.

Having thus resolved Nash's motion to allow testimony, the board considered the Borough's motion to present testimony of a borough staff member. Although a board member pointed out that this was essentially what Nash was attempting to do, the board accepted the Borough's evidence. It justified this decision by distinguishing between a witness who could speak as an employee of the Borough (a party to the matter), and the persons on Nash's proposed list, who were merely "interested parties." Nash objected to introduction of the affidavit on the ground that supplementing the record at the last minute denied him an opportunity to reply. In addition, a board member questioned whether it was fair to allow the Borough to offer testimony from an absent person but deny Nash similar opportunity to present testimony from interested persons at a later date. The board allowed the Borough's affidavit nonetheless.

At the hearing two borough staff members gave presentations, then Nash briefly stated his side of the case. Nash walked out of the proceedings before the Borough attorney's argument. He was accompanied by his father, who ultimately did not testify. Schuyler was allowed to speak, and testified that Nash's failure to perform under the contract resulted from the hurdles the Borough placed before him.

The same day as the hearing, the board released a written, four page decision upholding the Borough's termination of the contract. The decision stated the board's findings and conclusion, but did not discuss the evidence or rationale supporting those findings.

### 2. Superior Court

On March 10, 2003, Nash sued the Borough in superior court for breach of contract, breach of good faith and fair dealing, intentional interference with chattels, and intentional interference with contract. He argued that he deserved a trial de novo because the board deprived him of a fair and full hearing.

The Borough moved for judgment on the pleadings and a motion to designate the matter as an appeal and dismiss. After a hearing on September 15, 2003, Superior Court Judge Eric Smith ruled that Nash's contract-based claims for damages were functionally an administrative appeal. But the court ruled that it was "not clear from the pleadings whether the Borough's administrative procedures afforded the [p]laintiff due process." The court therefore requested additional briefing on whether the case required a trial de novo.

The superior court eventually found that the board hearing complied with the requirements of due process. In finding that the board provided due process, the court found that borough personnel explained to Nash that only interested parties could speak. The court also found that Nash's motion regarding interested parties could not have been addressed before the hearing because the board could not meet before then. The superior court concluded that there was no due process violation concerning the board's limitations on testimony, because the board allowed all who were present at the meeting (Schuyler and Nash's father) to testify.

The superior court concluded that Nash's problems were his "own making," and that the borough code simply did not permit the borough clerk or board chair to give Nash the assurances he wanted. The superior court further concluded:

It is true that Mr. Nash was not able to depose witnesses, to serve interrogatories, to request materials, or to cross-examine the witnesses. But there is no requirement in the case law that an administrative

appeal must always follow all of the procedures afforded a party in a civil trial. Rather, the focus is on whether Mr. Nash received a fair and full opportunity to make his case in the context of a regulatory rather than a judicial decision. In such a context, there is no requirement that the [board] provide for discovery or cross-examination.

Due process thus resolved, the parties addressed the merits of the board's decision. On October 6, 2005, Nash moved to supplement the administrative record to include the Oilwell Road Agreement of March 24, 1999. The court granted this motion. On April 17, 2006, the court ruled that it would "hold an evidentiary hearing to determine the meaning of the road agreement, and will then fold its findings regarding the agreement into its evaluation, as an administrative appeal, of the [board] decision."

On February 25, 2008, after the hearing regarding the road agreement, the superior court issued an order upholding the Borough's termination of the contract. The superior court found that the road agreement "was a cooperative agreement delineating certain voluntary undertakings by the signatories" and "did not explicitly or implicitly modify the timber sale contract." It also concluded that the board's decision to uphold the termination of the contract was supported by substantial evidence, "primarily because Mr. Nash's failure to perform on the contract provided an adequate basis for the Borough to terminate the contract."

Nash now appeals, arguing that the board violated his due process rights and that the Borough improperly terminated the contract.

## III. STANDARD OF REVIEW

We review for abuse of discretion a superior court's decision to conduct an administrative review instead of a trial de novo.[1] "To find an abuse of discretion, we must be 'left with a definite and firm conviction after reviewing the whole record that the trial court erred in its ruling.' "[2]

Where the superior court conducts a partial trial de novo, we review the court's findings and conclusions.[3] Factual findings by the superior court are reviewed under the clearly erroneous standard,[4] while legal issues are reviewed de novo.[5]

## IV. DISCUSSION

Nash argues that, because the board proceedings did not afford him due process, the superior court erred in denying him a full trial de novo. He argues in the alternative that the timber sale contract entitled him to trial de novo. He also asserts that the road agreement modified the timber sale contract and that the contract was improperly terminated. Because we agree with his due process claim and remand for a full trial de novo, we do not decide whether the road agreement modified the timber sale contract, whether the timber sale contract entitled him to trial de novo, or whether the timber sale contract was properly terminated.

### Nash Did Not Receive Due Process In The Board Proceeding.

Nash argues that the board violated his due process rights in several ways: by failing to provide discovery procedures, by restricting his right to present witnesses, and by generally failing to properly handle the hearing.

The Borough argues that the procedures were sufficient to satisfy the requirements of due process and that Nash has failed to make a requisite showing of prejudice. It points out that Nash was in fact allowed to call all of the individuals he requested on his witness list, except for those who did not show up to the hearing.

1. *Treacy v. Municipality of Anchorage*, 91 P.3d 252, 270 (Alaska 2004).

2. *Id.* (quoting *Christensen v. NCH Corp.*, 956 P.2d 468, 473 (Alaska 1998)).

3. *City of Nome v. Catholic Bishop of N. Alaska*, 707 P.2d 870, 875 (Alaska 1985).

4. *Id.* at 876.

5. *Jacob v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 177 P.3d 1181, 1184 (Alaska 2008) (quoting *Guin v. Ha*, 591 P.2d 1281, 1284 n. 6 (Alaska 1979)).

The superior court determined that Nash had received adequate procedural opportunities to present his case, and that the problems he experienced at the administrative hearing "were of [his] own making." Accordingly, the court found that the board afforded Nash due process. The court denied Nash full trial de novo on his contract claims.[6]

■■■ Article I, section 7 of the Alaska Constitution guarantees the right of due process. Due process in the administrative context does not demand that every hearing comport to the standards a court would follow, but rather that the administrative process afford an impartial decision-maker, notice and the opportunity to be heard, procedures consistent with the essentials of a fair trial, and a reviewable record.[7] A violation of due process should be alleged with particularity and a showing of prejudice.[8] We stated in *Keiner v. City of Anchorage*[9] that a party is "entitled to a trial de novo, in whole or in part, if he [has] been denied the opportunity to present to the [Board] relevant and material evidence supporting his claim...."[10]

■ We agree with Nash that his inability to present witness testimony to the board violates these standards of due process. We cannot find due process in a hearing where parties do not know if they will be allowed to call witnesses until the hearing has actually begun. Accordingly, we cannot agree with the conclusion that Nash's problems were of his own making. Rather, the record indicates a series of irregularities that effectively denied Nash notice and the opportunity to be heard, and the board failed to provide procedures consistent with the essentials of a fair trial.

The board's procedures for testimony, letting only "interested parties" testify, is not consistent with our requirements for due process. While a hearing need not be identical to a judicial proceeding, the board's exclusion of witnesses who are not "interested parties" narrows the record to something markedly less than a full opportunity to be heard, and prevents a party from presenting relevant, material evidence. The present case was relatively complex, involving contract performance over the span of a decade; investments allegedly of well over one million dollars; and the involvement of private parties, the federal government, state government, and local government. In light of these complex issues, Nash was prepared to present testimony from "witnesses who would knowledgeably address topics from the terrible condition of the MSB maintained portion of [Oilwell] Road ... to the absence of any [F]orest [P]ractices [A]ct violations on the sale." However, by limiting testimony to only interested parties, the board prohibited Nash from presenting this relevant and material evidence. We believe that such a narrow hearing effectively rendered Nash unable to present his case—precisely the due process violation that *Keiner* contemplated would justify a trial de novo.[11]

Moreover, it is inappropriate for a claimant in an administrative hearing not to know in advance if he will be allowed to call witnesses at the hearing. Adequate, fair procedures should provide notice as to who may testify. While it is understandable that uncertainties might arise from time to time, we believe the

---

6. The court did grant a de novo hearing on whether the road agreement modified the contract, since that issue was not addressed before the board.

7. *Keiner v. City of Anchorage*, 378 P.2d 406, 409–10 (Alaska 1963) (citing *St. Joseph Stock Yards Co. v. United States*, 298 U.S. 38, 73, 56 S.Ct. 720, 80 L.Ed. 1033 (1936) (Brandeis, J., concurring: "The inexorable safeguard which the due process clause assures is, not that a court may examine whether the findings as to [specific facts] are correct, but that the trier of the facts shall be an impartial tribunal; that no finding shall be made except upon due notice and opportunity to be heard; that the procedure at the hearing shall be consistent with the essentials of a fair trial; and that it shall be conducted in such a way that there will be opportunity for a court to determine whether the applicable rules of law and procedure were observed.")).

8. *Keiner*, 378 P.2d at 409.

9. *Id.* at 406.

10. *Id.* at 409; *see also State v. Lundgren Pac. Const. Co.*, 603 P.2d 889, 895–96 (Alaska 1979) (finding a right to trial de novo where administrative procedure did not afford due process).

11. *See* 378 P.2d at 409.

resolution of the uncertainty in the present case was inadequate. Nash filed a motion asking for special permission to call witnesses, as appears permissible under Mat–Su Borough Code 15.39.190. But the board did not respond. Nash requested, in the alternative, that if a decision could not be made in advance of the board meeting, that the board delay the hearing on the merits until a later date. This would have been a prudent course of action, and the record does not show why the board did not grant Nash's request. In short, we cannot agree with the superior court that Nash's problems resulted from his own doing; rather, we conclude that the board's limitations—effectively denying advance notice as to who may testify—were too restrictive.

The Borough unconvincingly contends that there was no denial of witness testimony since those present were all allowed to speak. To the contrary, the paucity of witnesses present was more likely a result of the board's inability to decide in advance who would be able to testify, and was thus indicative of procedures inconsistent with the essentials of a fair trial. Nash repeatedly asked for assurances as to which witnesses would be able to speak, and whom he should ask to travel to the hearing. Yet by the time of the hearing, it was not clear whether the board would allow any witnesses. In addition, Nash claims that the borough clerk had already told him that witnesses would not be allowed to speak. Even if the clerk's answer was more equivocal than Nash understood it to be, it is clear that the Borough had not indicated, with any degree of certainty, who would be allowed to testify.[12] Thus, the Borough's argument that the matter came down to merely who was or was not present is not persuasive.

It is true that one witness (Schuyler, with the Susitna Soil and Water Conservation District) appeared at the hearing and the Borough did allow him to testify. But the barrier Schuyler faced in testifying was itself problematic. Throughout the hearing the chair was resistant to Schuyler's testifying, asserting that Schuyler should not be allowed to testify because he was not an interested party. This undermines the Borough's contention that it would, in all likelihood, have allowed witnesses to testify as long as they were present. Further, Schuyler's testimony demonstrates the lack of clarity behind the board's interested party requirement: The fact that a government employee with obviously relevant testimony to offer was reluctantly granted a special exception—even though not an "interested party"—lends support to Nash's contention that he had no guarantee that any of his desired witnesses would be allowed to speak.[13]

An additional procedural flaw is evident in the board's ruling that Nash had no standing to object to the board's refusal to allow a witness to testify.[14] A party cannot be denied standing to argue an issue as fundamental as what testimony may be presented.[15] We find no basis for the board's decision regarding standing, and it is certainly not procedure consistent with the essentials of a fair trial.

We are also troubled by the board's acceptance of an affidavit from the Borough soon after denying Nash's requests to allow witnesses to testify. The affidavit was from a city employee, testifying to the merits, and was allowed into the record so that the employee would not have to leave his office during a busy day. In our view, the affidavit was quite similar to Nash's request regarding witness testimony, and the board had no basis to reject Nash's request while allowing

12. Moreover, that Nash had to rely on oral guarantees from the borough clerk is itself indicative of an inadequate procedural framework.

13. Indeed, Schuyler only testified over the objection of the chair, and as a special exception, because Schuyler had traveled since 2:00 a.m. over icy roads to attend the hearing—in the words of one board member who argued in favor of allowing Schuyler to speak, "We are still in Alaska."

14. The board reached this strange ruling on the ground that only a witness could assert a right to testify, not a party.

15. See Keiner, 378 P.2d at 409 (requiring essentials of fair trial and noting that new trial is remedy where party was not allowed to present relevant and material evidence).

the Borough's. Coming on the heels of the chair's utter resistance to Nash's witnesses, the board's asymmetric allowance of the Borough's affidavit appears to fall short of the procedural fairness required for due process.

In sum, we find that the board did not afford Nash a full opportunity to be heard nor provide procedures consistent with the essentials of a fair trial. Rather, he was prohibited from presenting relevant, material evidence, and was thereby effectively denied due process. Under these circumstances, a trial de novo is appropriate in the superior court.[16]

## V. CONCLUSION

In light of the board's restrictions on testimony, we find that its hearing did not comport with due process. Accordingly, we REVERSE the superior court's due process ruling and REMAND for a trial de novo.

EASTAUGH, Justice, not participating.

---

**16.** We do not address Nash's argument that the road agreement modified the timber sales agreement because relevant evidence on this issue may emerge during the de novo trial. Accordingly, we vacate the superior court's conclusion that no modifications had occurred and remand this matter for trial.