*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| R. BRETT STIRLING,<br><br>    Appellant,<br><br> v.<br><br>NORTH SLOPE BOROUGH SCHOOL DISTRICT,<br><br>    Appellee. | Supreme Court No. S-18853<br><br>Superior Court No. 2BA-22-00238 CI<br><br>O P I N I O N<br><br>No. 7755 – March 14, 2025 |

Appeal from the Superior Court of the State of Alaska, Second Judicial District, Utqiaġvik, David L. Roghair, Judge.

Appearances: Jennifer M. Coughlin, Landye Bennett Blumstein, LLP, Anchorage, for Appellant. Allen F. Clendaniel, Sedor, Wendlandt, Evans & Filippi, LLC, Anchorage, for Appellee.

Before: Maassen, Chief Justice, and Borghesan, Henderson, and Pate, Justices. [Carney, Justice, not participating.]

HENDERSON, Justice.

## I. INTRODUCTION

A school principal used the school's printer after hours to create a coaster as a retirement gift for a friend. The coaster design contained the School District's official logo, including the logo's illustration of Alaska Native children engaged in a traditional blanket toss, but changed the statement of the District's motto. A custodian

working at the time took pictures of the coaster, and the pictures were subsequently shared on social media alongside commentary expressing that the coaster was disrespectful to Alaska Native peoples.  The principal left the community the day after the social media posts.

The District thereafter notified the principal that it proposed to terminate him for incompetence and for violating the School Board's anti-harassment policies and related state regulations.  Following a brief pretermination hearing, the District terminated the principal.  The principal appealed, and the Board upheld the principal's termination following an additional hearing.  The principal appealed to the superior court, which also affirmed his termination.  The principal now appeals to us.

Given the principal's conceded inability to continue doing his job following the events in question, we affirm his termination.  However, given the lack of process provided during the principal's pretermination hearing, which was then remedied at his post-termination hearing, we reverse the superior court's decision denying back pay through the date of the Board's on-record post-termination hearing decision.

## II.  FACTS AND PROCEEDINGS

### A.  Facts

From July 2020 through February 2022 R. Brett Stirling served as the principal of Kali School in Point Lay in the North Slope Borough School District (the District).  In January 2022 Stirling sent a series of emails and a letter to District administrators about various challenges at his school.  In these emails and letter, he asked for assistance related to a recent homicide by a staff member's brother in a school housing unit; criticized a new District policy related to charging long-term substitute teachers rent; expressed concerns about staff members smoking marijuana outside a classroom; identified problems with the school's phones; expressed concerns about rising COVID-19 cases; and complained of staffing shortages.

On January 26, around 7:00 or 8:00 p.m., Stirling went to Kali School and brought his own wood to use the school's laser printer to make some coasters for himself and as a retirement gift for his friend, a fellow principal in the District. The school was empty except for two custodians who were working that evening. The coasters Stirling made featured a modification of the District's official logo. The logo contains an illustration of Alaska Native children performing a traditional blanket toss and the motto "Striving for Excellence" along with the District's name. Around the District logo Stirling wrote the text "Congratulations You survived NSBSD" and "Time for a fucking drink," and included an image of two beer mugs. Inside the logo he replaced the motto with "Striving for Excrement" and the District's name with "New Stupid Behaviors Starting Daily." Stirling did not alter the illustration in the middle of the logo.

Later that evening a school teacher in Utqiaġvik posted pictures of the coasters on Facebook, along with a caption stating the coasters were disrespectful to Alaska Native peoples. A screenshot taken in April 2022 shows that the Facebook post generated at least 285 reactions, 298 shares, and 29 comments.

After the Facebook post was made, Stirling texted one of the custodians working that night, who he assumed had taken the photographs of the coasters and shared them with the teacher who posted them on social media. He asked the custodian why she shared the photographs. The custodian texted him, "Of all the things you could have made, you made that with the words—whatever you made with [the District's] logo. Do you really think that we're crap?" Stirling texted the custodian an apology and explained he did not think anyone in Point Lay was crap and was instead expressing frustration with District decisions. Stirling decided to leave Point Lay the next morning and fly to Utqiaġvik because he was concerned about his own safety. The District Assistant Superintendent approved of this decision.

The next day someone posted the photographs of the coasters on Twitter with the caption: "This is disgusting . . . Some of these administrators have no respect

when it comes to our people and this is a prime example." The tweet generated at least 48 retweets, 15 quote tweets,[1] and 125 likes.

## B. Proceedings

### 1. District investigation and pretermination hearing

On January 28 the District's Human Resources Director met with Stirling and a union representative. The Human Resources Director informed Stirling that the meeting was strictly confidential, but he recorded the meeting without Stirling's knowledge, and the recording was later admitted into evidence at the Board hearing without objection from Stirling. Stirling said he did not think he could return to Point Lay, stating that he did not believe he could "be an effective leader" if the majority of the community believed he was racist.

Later that day the Human Resources Director issued a report to the District recommending Stirling's employment be terminated because "Stirling willfully operated company property for personal use that unwittingly disparaged the good people and students of Point Lay." The report concluded that "this disparagement and the public's use of social media makes it impossible for [Stirling] to return to the village and District to continue his work as School Administrator." That day the Assistant Superintendent also sent Stirling a letter that informed him that he was "on paid administrative leave pending further investigation" and requested he report to the District office on January 31 for a meeting with her.

On January 31 the Superintendent sent Stirling a letter notifying him that the District proposed to terminate his employment because his conduct "constitute[d] (1) incompetence and (2) substantial noncompliance with applicable education laws and regulations." The letter stated Stirling would receive administrative leave with pay

---

[1] A quote tweet "allows you to post another person's [tweet] with your own comment added." *About different types of posts*, X HELP CENTER, http://help.x.com/en/using-x/types-of-posts (last visited Dec. 2, 2024).

through February 3.  The letter explained that the District believed Stirling was incompetent to serve as a principal under AS 14.20.170(a)(1) because he "used a District printer and computer to make [a] racist, profane and offensive coaster that demeaned District students and employees."  It also stated Stirling was "unable to perform the duties of a principal" due to his conduct "and the North Slope community's loss of trust and respect for [him]."  Finally, it indicated that Stirling's conduct "constitute[d] substantial noncompliance with the school laws of the state and the Board Policies of the District, which is grounds for dismissal under AS 14.20.170(a)(3)" because the "coasters constituted racial harassment and discrimination of the Kali School's Native Alaskan students as well as all of the District's Native Alaskan students."  The letter informed Stirling that it considered his conduct harassment of students and employees.

The letter also notified Stirling he was entitled to a pretermination hearing under AS 14.20.180(a) and Board Policy 4117.4.  It explained that the purpose of the hearing was to provide Stirling "an opportunity to contest the grounds for [his] dismissal" and offer reasons why he should not be fired.  It also notified Stirling that he could bring a representative to the hearing.  The letter scheduled the pretermination hearing for February 2.

On February 2 the District held the pretermination hearing attended by the Superintendent, the Assistant Superintendent, a union representative, and Stirling.  The Assistant Superintendent read the letter provided to Stirling on January 31 into the record.  The Superintendent summarized the investigation, explained that the evidence the District had considered included the photographs of the coaster, and indicated that the District would provide Stirling the evidence along with the recording of the pretermination hearing the next day.  The Superintendent concluded by stating that Stirling's use of District property to "willfully disparage[] the good people and students of Point Lay" made it "impossible for [him] to return to the village and the District to continue his work as a school administrator."

Stirling read into the record a letter he had sent to the District. He stated that he did not create the design on a District computer and claimed that he created the coaster because he was expressing frustration about the District to his friend in a private message. He stated that he recognized that being placed back at Point Lay was "not an option," and he offered to resign in April to allow him time to receive the health care he needed to recover from the stressors of the job.

## 2. Stirling's termination and Board hearing

The next day the Superintendent sent Stirling a letter notifying him that he was "dismiss[ed] for cause from employment" with the District for incompetence and "substantial noncompliance with school laws of the state" and Board policies. The letter largely repeated the points stated in the pretermination letter. It informed Stirling that he could contest the dismissal by notifying the Superintendent in writing that he wanted a formal hearing before the Board under AS 14.20.180(d) or invoking the grievance procedures under AS 14.20.180(e). The same day Stirling also received a letter informing him that he would not be retained for the following school year. In mid-February Stirling sent a written request for a public hearing before the Board challenging his termination.

Before the hearing Stirling and the District submitted trial briefs, exhibit lists, and witness lists. Stirling's exhibits included his contracts with the District, the notice of termination, an administrative leave letter, emails and a letter he sent to District officials in January 2022 regarding difficulties in Point Lay, a copy of the District's COVID-19 mitigation plan, emails and documentation of a labor relations mediation in which Stirling was involved, and relevant excerpts of the Board's policies and code of ethics. The District's exhibits included the Twitter and Facebook posts about the coasters, the investigation summary, the notice of proposed termination, the notice of termination, the notice of non-retention, Stirling's employment contracts, the recording of the January 28 interview with Stirling, photos of the coasters, and Stirling's letter responding to the proposed termination.

The Board held an administrative hearing at the end of April.

The District called five witnesses: the teacher who had posted the photos of the coaster on Facebook, the Assistant Superintendent, the current principal at Kali School, the Human Resources Director, and the Superintendent. All of the District's witnesses testified that they found the coaster offensive and disrespectful to the people of Point Lay and the North Slope. For instance, the Assistant Superintendent testified that she felt the coaster was racist because it paired the words "excrement" and "stupid" with the illustration of Native children. The Superintendent testified that he had also heard from "many, many people" in the community who were outraged by the incident and perceived the coaster as racist.

Stirling called seven witnesses: a current Kali school teacher, two long-time Point Lay residents, a middle school principal, a union representative, the retiring principal for whom he had made the coaster, and himself.

A current Kali school teacher testified that she had worked as a teacher in Point Lay for five years and that Stirling was an easy principal to work with. She stated that earlier in January, before the coaster incident, the teacher who posted the photos to Facebook had stopped by her house for a social visit and mentioned that he wished Stirling would get fired. A life-long Point Lay resident testified that he had also heard from the same teacher that he wanted to get Stirling fired.

Several of Stirling's witnesses testified that the coaster seemed like an expression of frustration with the District rather than intentionally racist or directed at Alaska Native people, though two of those witnesses admitted that they could understand why people might have found it offensive. For instance, a long-time Point Lay resident said that the coaster may have elicited memories of the historical trauma of Alaska Native children being forced to attend boarding schools. That same resident testified that he did not think it would have been safe for Stirling to stay in the village after the community found out about the coaster, as he had seen social media posts by individuals who expressed a desire to harm Stirling. Another long-time resident

testified that although she understood why people were offended, she believed Stirling had ultimately taken responsibility for the coaster and that he should not have been fired over it.

The retiring principal for whom the coaster was intended testified that he had worked for the District for two years and that he had recently returned from extended medical leave necessitated by a heart condition. He stated he understood the phrase "you survived NSBSD" meant literally he "made it through without having a heart attack." The retiring principal explained that he and Stirling vented to each other about the problems they faced in their jobs and compared those problems to "crap" frequently. He stated that when he saw the word excrement on the coaster, he thought that it referred to stressful situations Stirling was dealing with and he knew that it was not a reference to the staff or students. The retiring principal testified that every time he and Stirling talked, Stirling was very clear that he was frustrated with these problems because they created obstacles to serving the children, which was always Stirling's primary focus.

Stirling testified on his own behalf, stating he never intended to insult Alaska Native people, he had worked in rural villages in Alaska for 17 years, and he had "nothing but respect and admiration for the people of The Slope and the Native peoples of Alaska." Stirling acknowledged that during his January 28 interview with the Human Resources Director he had stated he did not think he could return to the community; however, he discounted this statement, explaining that he made that statement only 36 hours after the Facebook post about the coaster and when he had slept for only four of the prior 48 hours.

At the end of the hearing the Board unanimously found by a preponderance of the evidence that the District demonstrated it had cause to terminate Stirling. At the beginning of May the Board issued a written decision affirming the District's decision to terminate Stirling's employment. The Board explained that Alaska law governing termination of teachers also applies to principals. The Board

concluded that Stirling's conduct constituted incompetency under AS 14.20.170(a)(1) because he used District equipment to produce "an offensive and demeaning coaster, . . . render[ing] himself unable to perform the customary duties of a principal in a satisfactory manner." It also decided that the District had cause to dismiss Stirling under AS 14.20.170(a)(3)[2] because "[t]he coaster design was demeaning, hurtful[,] and offensive to the Iñupiat students and staff of the North Slope Borough School District" and "[h]is actions constituted racial harassment and violated 20 AAC 10.020(b)(6) and Board Policies 4119.21, 4119.12, and 5145.5." Finally, it determined that "[t]he District Administration provided Mr. Stirling with the constitutional and statutory due process required by providing him with the proposed grounds for termination and a pretermination hearing."

### 3. Superior court proceedings and appeal

Stirling appealed the Board's decision to the superior court. He argued that the District's grounds for his termination were not supported by substantial evidence, his coaster amounted to protected speech under AS 14.20.095, and the pretermination hearing process violated his due process rights.

In August 2023 the court affirmed the Board's decision to terminate Stirling's employment. The court applied the substantial evidence test to questions of fact and applied the rational basis test to questions of law because the District was "interpreting fundamental policies within the scope of its own statutory functions." It

---

[2] The District actually cited to AS 14.20.170(a)(2), but claims on appeal that this is a typo and that the Board intended to cite AS 14.20.170(a)(3). *Compare* AS 14.170(a)(2) (establishing teacher may be dismissed for "immorality, which is defined as the commission of an act that, under the laws of the state, constitutes a crime involving moral turpitude"), *with* AS 14.20.170(a)(3) (establishing teacher may be dismissed for "substantial noncompliance with the school laws of the state, the regulations or bylaws of the department, the bylaws of the district, or the written rules of the Superintendent"). The context of the decision indicates the Board intended to cite AS 14.20.170(a)(3) because the decision does not discuss immorality.

decided that there were grounds to terminate Stirling due to substantial noncompliance with District rules and regulations. The court concluded that "[w]hether or not . . . Stirling interpreted the coaster to promote any view about Alaska Natives, the facts at hand support that the community was reasonable to interpret the coaster as racially offensive." It explained, "Stirling changed everything else about the design of the logo, so a bystander, not knowing the context of Mr. Stirling's anger about the School District might see that as an intentional choice rather than an oversight on his part." The court concluded that the "District's finding of incompetence has a reasonable basis in law" because as "Stirling conceded at his pretermination hearing, he was unable to effectively perform his duties after the widespread sharing of his coaster design, and the negative public reaction to it."

The court also rejected free speech arguments Stirling had raised, reasoning that "the right to openly critique a government employer without fear of punishment does not extend to offensive or inappropriate speech." It also noted that "Stirling argues profusely that the coaster was private speech between himself and his friend — it was not public speech critical of his government employer," which would be protected under the First Amendment.

Regarding Stirling's due process arguments, the court acknowledged that the District's pretermination letter "should have put . . . Stirling on notice of his right to call witnesses — should he have wanted to — at his pretermination hearing," but concluded that "the District's failure to include information about . . . Stirling's right to call witnesses amounts to harmless error, particularly in light of the post-termination hearing he was afforded." Ultimately the court affirmed the Board's decision and denied Stirling's requested relief.

Stirling appeals.

## III. STANDARD OF REVIEW

"When a superior court acts as an intermediate court of appeals, we independently review the administrative decision."[3] Here, we therefore independently review the final administrative decision of the School Board.

"We review questions of fact under the 'substantial evidence' test. Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' We need only determine whether such evidence exists, and do not choose between competing inferences."[4] When interpreting and applying statutes, "[w]e apply the reasonable basis standard, under which we give deference to the agency's interpretation so long as it is reasonable, when the interpretation at issue implicates agency expertise or the determination of fundamental policies within the scope of the agency's statutory functions."[5] "We apply the independent judgment standard, under which 'the court makes its own interpretation of the statute at issue, . . . where the agency's specialized knowledge and experience would not be particularly probative on the meaning of the statute.' "[6]

We review constitutional questions, including questions regarding the scope of an individual's due process rights and free speech rights, de novo.[7]

---

[3]     *Titus v. State, Dep't of Admin., Div. of Motor Vehicles*, 305 P.3d 1271, 1276 (Alaska 2013) (quoting *Alaska Exch. Carriers Ass'n v. Regul. Comm'n of Alaska*, 202 P.3d 458, 460 (Alaska 2009)).

[4]     *Grimmett v. Univ. of Alaska*, 303 P.3d 482, 487 (Alaska 2013) (quoting *Handley v. State, Dep't of Revenue*, 838 P.2d 1231, 1233 (Alaska 1992)).

[5]     *Marathon Oil Co. v. State, Dep't of Nat. Res.*, 254 P.3d 1078, 1082 (Alaska 2011).

[6]     *Id.* (citing *Matanuska-Susitna Borough v. Hammond*, 726 P.2d 166, 175 (Alaska 1986)).

[7]     *Greene v. Tinker*, 332 P.3d 21, 31 (Alaska 2014).

## IV.  DISCUSSION

### A.  The Board Had A Reasonable Basis To Terminate Stirling's Employment On Grounds Of Incompetency.

Stirling's first broad argument on appeal is that the District lacked a sufficient basis for terminating his employment.  More specifically, Stirling contends that the evidence before the School Board was insufficient to demonstrate "incompetency" under AS 14.20.170(a)(1).[8]

Alaska Statute 14.20.170(a) establishes that a principal may be dismissed at any time for "incompetency, which is defined as the inability or the unintentional or intentional failure to perform the [principal's customary duties] in a satisfactory manner."[9]  Application of these statutory terms presents mixed questions of law and fact.  To the extent we are called upon to interpret the terms of AS 14.20.170 in this context, we apply the reasonable basis standard in light of the Board's expertise regarding the implicated job qualifications and duties, as well as the involvement of "fundamental policies within the scope of the [Board's] statutory functions."[10]  Here, we conclude that the Board had a reasonable basis to terminate Stirling's employment for incompetency under AS 14.20.170(a)(1).

Stirling contends that the Board lacked substantial evidence to find him incompetent under AS 14.20.170(a)(1) because it supported this finding merely by

---

[8]     Stirling also argues that the evidence was insufficient to demonstrate "substantial noncompliance" with applicable laws and rules pursuant to AS 14.20.170(a)(3).  Because we conclude the Board had a reasonable basis to terminate Stirling's employment under AS 14.20.170(a)(1), we do not reach whether the Board properly terminated his employment for separate reasons under AS 14.20.170(a)(3).

[9]     AS 14.20.170(a).  A principal may also be dismissed for immorality or for substantial noncompliance with applicable laws and rules, such as anti-harassment policies.  AS 14.20.170(a)(2)-(3).

[10]     *Davis Wright Tremaine LLP v. State, Dep't of Admin.*, 324 P.3d 293, 299 (Alaska 2014); *see also Marathon Oil Co.*, 254 P.3d at 1082.

stating "it was impossible for Stirling to perform his duties as principal once he printed out a coaster described by the Decision as 'offensive and demeaning.' " He argues that the social media posts the District relied upon were insufficient evidence to support his termination, because the posts only contained photographs of the coaster that were widely shared and did not show the impact of the post on Stirling's ability to work as a principal. He claims that the District's testimonial evidence was inadequate to prove community sentiment and that his witnesses demonstrated the coaster was interpreted only as a critique of the District. He discounts his own statements that he did not think he could return to Point Lay, explaining that he made these statements to the Human Resources Director only a day after the original Facebook post, when he was exhausted and stressed and had not examined the community reaction on social media. He also notes that he only admitted that he did not think he could "be an effective leader *if* the majority of the community believe[d] [him] to be a racist." Stirling argues that the Human Resources Director failed to consider moving Stirling to a different school within the District, and that the true motivation for his termination was to punish him for his criticism of the District.

Stirling's arguments, however, fail to account for both the statutory definition of incompetence that applies here and for the entirety of the evidence before the Board. Alaska Statute 14.20.170(a)(1) defines incompetency "as the inability or the unintentional or intentional failure to perform the teacher's customary teaching duties in a satisfactory manner." Here the testimony presented to the Board constituted substantial evidence to terminate Stirling's employment for incompetence. The Superintendent testified that he thought Stirling could no longer serve as a principal because the community found the coaster racist and offensive. The District supported this assertion through testimony from the teacher who initially posted the photographs, the Assistant Superintendent, the current principal of Kali School, and the Human Resources Director. Additionally, one of Stirling's own witnesses, a life-long resident of Point Lay, testified that while he did not personally find the coaster offensive, he

- 13 -                                                                                    **7755**

believed it was unsafe for Stirling to return to Point Lay because of other social media posts by individuals who may want to hurt Stirling and sentiment from community members who were offended by the coaster. Though some of the other witnesses testified that they were not personally offended by the coaster and viewed it as an expression of frustration with the District administration, there was substantial evidence to support the Board's finding that Stirling fundamentally lost the trust of the District administrators and community.[11] The District's exhibits also tend to demonstrate that the social media posts criticizing Stirling's coasters were fairly widely shared, supporting the Board's finding regarding community sentiment.

Perhaps most importantly, the District presented statements from Stirling himself that support a finding of incompetency. Stirling indicated in his interview on January 28 that he did not think he could return to Point Lay if the majority of the community thought he was racist. This statement and Stirling's decision to leave Point Lay support the conclusion that Stirling himself did not think that he could competently perform his job after the events at issue. Stirling argues that his admission during the January 28 interview has limited import because it occurred shortly after initial social media posts about the coasters. But Stirling repeated the sentiment during his pretermination hearing several days later, stating that he did not believe being placed back at Point Lay was an option. Stirling then offered to resign effective two months later. Particularly in light of Stirling's own assessment of his inability to perform his customary duties as principal, the evidence and testimony support the Board's decision to terminate Stirling's employment under AS 14.20.170(a)(1).

---

[11]     *Cf. Kilmer v. Dillingham City Sch. Dist.*, 932 P.2d 757, 765-766 (Alaska 1997) (affirming termination of superintendent and principal for incompetence because his actions led to lack of trust between Board and employee, rendering him unable to serve as superintendent and principal).

**B.** **The Board's Termination Of Stirling's Employment Violated Neither AS 14.20.095 Nor The First Amendment.**

Stirling appears to contend that his termination was also improper because it violated his rights to free speech. While Stirling grounds his free speech claim in AS 14.20.095, the superior court analyzed whether Stirling's speech was protected under the First Amendment to the United States Constitution and concluded that his speech was not protected. The District maintains that Stirling's creation of the coasters was protected by neither AS 14.20.095 nor the First Amendment. Stirling, on the other hand, argues that his speech was protected by AS 14.20.095, regardless of whether it was protected by the First Amendment. We conclude first that the protection for speech offered by AS 14.20.095 is coextensive with that offered under the First Amendment. Second, even assuming that Stirling's creation of the coasters at issue constituted speech that would be protected under both AS 14.20.095 and the First Amendment, we conclude that Stirling's free speech rights are outweighed by the District's legitimate interests in avoiding workplace disruption, meeting the needs of its students and the public, and maintaining public trust in the school system. We thus hold that Stirling's termination did not violate his free speech rights.[12]

We begin by analyzing the potential sources of protection for Stirling's speech: AS 14.20.095 and the First Amendment. Alaska Statute 14.20.095 prohibits the District and Board from "restrict[ing] or modify[ing] the right of a teacher to engage in comment and criticism outside school hours." The First Amendment similarly protects an employee's right to speak as a private citizen "addressing a matter of public

---

[12] Stirling and the District have both argued at times that we need not reach the free speech issue because it was not raised before the superior court. However, Stirling did argue before the superior court that his speech was protected under AS 14.20.095, and on appeal he argues the superior court erred in its free speech analysis. We therefore address the issue here.

concern," although it permits an employer to limit such speech if the employer's legitimate administrative interests outweigh the employee's rights.[13]

Stirling argues that even if his speech is not protected by the First Amendment, as the superior court concluded, it is still protected by our state statute. But the context and limited precedent surrounding AS 14.20.095 and subsequent developments in First Amendment law support the conclusion that a teacher's free speech rights under AS 14.20.095 do not exceed the scope of the First Amendment. We observe that AS 14.20.095 was enacted at least partially in response to our 1964 opinion in *Watts v. Seward School Board*.[14]  In *Watts* we held that the dismissal of two teachers was justified because their criticisms of the school superintendent and board "had a tendency to bring . . . the teaching profession into public disgrace or disrespect."[15]  The legislature enacted AS 14.20.095[16] soon thereafter to protect teachers' "right to comment and criticize" outside school hours, though the statute did not go so far as to shield teachers who defame a school or public officials or bring the school into "public disgrace." [17]  This added a layer of protection for teachers' free speech rights, which

---

[13]     *Garcetti v. Ceballos*, 547 U.S. 410, 423 (2006) (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)).

[14]     395 P.2d 372 (Alaska 1964), *vacated Watts v. Seward Sch. Bd.*, 381 U.S. 126 (1965) (per curiam).

[15]     *Id.* at 375.

[16]     AS 14.20.095 (1965) was subsequently amended in 1966, but substantively remained largely the same.  *Compare* Ch. 98, § 13, SLA 1966, *with* Ch. 14, § 1, SLA 1965.  The 1965 and 1966 versions of AS 14.20.095 were passed as part of major revisions to education laws in Alaska.  *See* Alaska Leg. Council, Staff Background Report with Preliminary Draft:  Revision of School and Education Laws 1 (1964).

[17]     After signing the bill into law, the Governor sent a letter to the Legislature noting that the law did not give teachers "a special privilege to criticize others . . . with impunity."  Legis. Reporting Serv., Rep. No. 12, 4th Leg., 1st Sess. at 141 (Mar. 8, 1965).

rested on uncertain legal ground at the time. Just three years later, however, the United States Supreme Court held in *Pickering v. Board of Education* that the First Amendment similarly protects teachers' right to "comment on matters of public interest in connection with the operation of the public schools in which they work."[18] That holding effectively rendered AS 14.20.095 coextensive with the First Amendment[19] — a conclusion supported by our subsequent *Watts* decision upholding teacher disciplinary sanctions.[20] Indeed, we have more recently analyzed teachers' speech-related rights by referencing the protections offered by the First Amendment, with no discussion or mention of AS 14.20.095.[21]

Under a First Amendment analysis, Sterling's free speech rights were not without limit. In analyzing whether a public employee's free speech rights were violated, a reviewing court performs a two-step inquiry.[22] The court must first decide whether the speech was made pursuant to the employee's official duties, or whether the employee "speaks as a citizen addressing a matter of public concern."[23] If the speech is made pursuant to the employee's official duties then "the Free Speech Clause generally will not shield the individual from an employer's control and discipline," but if the speech addresses a matter of public concern then a court must proceed to the second step.[24] In the second step the court must decide whether the employee's speech interests "are outweighed by the interest of the State, as an employer, in promoting the

---

[18]     391 U.S. at 568.

[19]     *See Watts v. Seward Sch. Bd.*, 454 P.2d 732, 737 (Alaska 1969).

[20]     *Id.*

[21]     *Shatting v. Dillingham City Sch. Dist.*, 617 P.2d 9, 12 (Alaska 1980) ("[A] school board may not deny continued employment to a teacher because of the teacher's exercise of first amendment rights.").

[22]     *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 527-28 (2022).

[23]     *Id.* (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 423 (2006)).

[24]     *Id.*

efficiency of the public services it performs through its employees."[25]  If the State's "legitimate countervailing interests are sufficiently strong," the court will uphold the State's restriction.[26]

The second step of the inquiry is dispositive in this case.  Assuming without deciding that Stirling's creation of the coasters amounted to private speech regarding a matter of public concern that would trigger First Amendment protection, we must still conduct "a fact-sensitive and deferential weighing of the government's legitimate interests" as an employer against Stirling's First Amendment rights.[27]  Here, any speech-related rights Stirling may have had were outweighed by the Board's legitimate interest in fulfilling its responsibilities to its students and to the public.  The Ninth Circuit has explained that within the educational context a court may consider "whether students and parents have expressed concern that the plaintiff's conduct has disrupted the school's normal operations, or has eroded the public trust between the school and members of its community."[28]  Here the Board determined Stirling's speech was especially disruptive to normal operations and damaging to the public trust because he served in a leadership role in the school community—a conclusion supported by Stirling's own testimony.  The Board's concerns fell within its legitimate "interest[s] in the effective and efficient fulfillment of [its] responsibilities to the public, including promot[ing] efficiency and integrity in the discharge of official duties, and maintain[ing] proper discipline in public service."[29]  We thus conclude that Stirling's

---

**25**     *Id.* (internal citations omitted).

**26**     *Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 675-76 (1996).

**27**     *Id.* at 677.

**28**     *Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 725 (9th Cir. 2022).

**29**     *See Lane v. Franks*, 573 U.S. 228, 242 (2014) (internal quotation marks omitted) (quoting *Connick v. Myers*, 461 U.S. 138, 150-51 (1983)).

termination did not violate his free speech rights under AS 14.20.095 or under the First Amendment.

### C. Stirling Was Not Provided Sufficient Process Prior To His Termination.

Stirling next argues that even if his termination is upheld, the District failed to provide him an adequate pretermination hearing, violating his procedural due process rights and its obligations under AS 14.20.180(a).[30] Stirling thus maintains that even if his termination was ultimately appropriate, he should have remained "on administrative leave with pay until" he received sufficient process through the Board's April 2022 post-termination hearing. Among other arguments, he contends that the District's pretermination notice did not inform him that he would be able to provide evidence or witnesses.

The District responds that it gave Stirling notice through a three-page letter that detailed the factual and legal grounds for his proposed termination along with information about the "date, time, and location of the pretermination hearing." It asserts it provided him the requisite process during the pretermination hearing because the Assistant Superintendent read the notice of proposed termination and the Superintendent explained the evidence and legal grounds for Stirling's termination. In addition the District notes that it gave Stirling an opportunity to respond to this information, which he did by reading a letter, and that Stirling did not ask to present any evidence or call any witnesses. It also maintains Stirling was provided an adequate post-termination hearing.[31]

---

[30] *See* AS 14.20.180(a) ("Before a teacher is dismissed, the employer shall give the teacher written notice of the proposed dismissal and a pretermination hearing. A pretermination hearing under this section must comport with the minimum requirements of due process, including an explanation of the employer's evidence and basis for the proposed dismissal and an opportunity for the teacher to respond.").

[31] Both parties agree that Stirling was provided with adequate process in the post-termination hearing before the Board.

Under the Alaska[32] and the United States[33] Constitutions the state may not "deprive individuals of property without due process of law."[34] As a public employee that could only be terminated for cause under AS 14.20.170, Stirling had a property interest in his continued employment.[35] Alaska Statute 14.20.180(a) requires that before terminating a teacher's employment the District must "give the teacher written notice of the proposed dismissal and a pretermination hearing," and that hearing "must comport with the minimum requirements of due process, including an explanation of the employer's evidence and basis for the proposed dismissal and an opportunity for the teacher to respond."[36] Under both the Alaska and federal Constitutions, "[i]n employment termination cases in particular, due process requires '[a]t a minimum' that the employee 'receive oral or written notice of the proposed discharge, an explanation of the employer's evidence, and an opportunity to present his position.' "[37] "Although a full judicial hearing is not required [prior to termination], the employee must be allowed to present a defense by testimonial and other evidence."[38] A constitutionally unlawful dismissal can be "cured by a post-termination hearing," but in that circumstance the appropriate relief is backpay up to the time of the post-termination hearing decision.[39]

---

[32]    Alaska Const. art. I, § 7.

[33]    U.S. Const. amend. XIV, § 1.

[34]    *City of N. Pole v. Zabek*, 934 P.2d 1292, 1297 (Alaska 1997).

[35]    *See* AS 14.20.170.

[36]    AS 14.20.180(a).

[37]    *Grimmett v. Univ. of Alaska,* 303 P.3d 482, 488 (Alaska 2013) (quoting *Zabek*, 934 P.2d at 1297).

[38]    *Storrs v. Mun. of Anchorage*, 721 P.2d 1146, 1150 (Alaska 1986).

[39]    *N. Slope Borough v. Barraza*, 906 P.2d 1377, 1381 (Alaska 1995).

We conclude that although the District's pretermination process in this matter certainly provided Stirling with notice of his proposed termination and the District's reasons for seeking his termination, the District's notice and hearing procedures failed to meaningfully provide for Stirling's right to "present a defense by testimonial and other evidence."[40]  Although due process does not strictly require that an employee be able to call and examine witnesses at a pretermination hearing in all circumstances, we have previously recognized that "the charge of teacher incompetency [is] sufficiently serious to warrant the heightened procedural protection that the right to call witnesses brings."[41]  Here, where the District's proposed bases for termination included incompetency and other "substantial noncompliance with school laws of the state," including alleged harassment and discrimination, due process required that Stirling be able to call and examine witnesses during the course of his pretermination hearing.[42]

The District did inform Stirling via letter that he was entitled to a pretermination hearing and that he would have an opportunity to contest his dismissal and to bring a representative of his choice to the hearing.  But the District did not notify Stirling, either before or during the hearing, that he would have the opportunity to call witnesses.  Absent such notice, we do not expect that Stirling could or should have understood that he could call witnesses at this stage.  As we have previously held, where due process requires that parties be able to call witnesses during a hearing, "[w]e cannot find due process [was provided] . . . where parties do not know if they will be allowed to call witnesses until the hearing has actually begun."[43]  Given that Stirling was not

---

[40]  *Storrs*, 721 P.2d at 1150.

[41]  *Zabek*, 934 P.2d at 1298 (Alaska 1997) (citing *Nichols v. Eckert*, 504 P.2d 1359, 1365 (Alaska 1973)).

[42]  *Id.*

[43]  *Nash v. Matanuska-Susitna Borough*, 239 P.3d 692, 699 (Alaska 2010).

informed of any opportunity to call witnesses during his pretermination hearing, the hearing process failed to comply with constitutional due process requirements.

Both parties agree, however, and we conclude, that Stirling was provided with adequate process in his post-termination hearing before the Board. Stirling is therefore entitled to back pay from the time of his termination on February 3 until the Board's on-record decision at the conclusion of its post-termination hearing on April 25.[44]

## V.   CONCLUSION

We AFFIRM the superior court's decision upholding the Board's decision terminating Stirling's employment.  We REVERSE the superior court's holding affirming the Board's decision that the District's pretermination hearing complied with its due process obligations, and REMAND for calculation of back pay through the date of the Board's post-termination hearing and decision.

---

[44]     *See N. Slope Borough*, 906 P.2d at 1381.